In the Matter of the Estate of HENRY C. WEST, Deceased.

Surrogate's Court, New York County, March 8, 1941.

*Mitchell, Taylor, Capron & Marsh* [*C. Alexander Capron* and *James K. Taylor* of counsel], for the petitioner.

*Larkin, Rathbone & Perry* [*Albert Stickney* and *Albert B. Maginnes* of counsel], for Emma M. West, objectant.

*Butler, Wyckoff & Reid*, for Marie Elizabeth West Jones and Elizabeth Frances Jones, respondents.

*Gerald P. Culkin*, special guardian.

FOLEY, S.   In this accounting proceeding the answers of certain of the parties and the report of the special guardian have raised numerous issues involving salvage operations of mortgaged properties acquired by a trustee by foreclosure or by deed in lieu of foreclosure.   Such issues involve in part questions as to the effect of the decisions of the Court of Appeals in *Matter of Chapal* (269 N. Y. 464) and *Matter of Otis* (276 id. 101), and in part the effect of the recently enacted section 17-c of the Personal Property Law, which modified in certain phases the former rules in salvage operations.   The briefs of the various attorneys have analyzed these questions with commendable thoroughness.

Under the terms of the testator's will, the residuary estate was devised and bequeathed in trust, " to apply the net income from said estate to the use of my wife, Emma M. West, during the term of her natural life, or until she shall remarry."   Upon the death of the testator's widow, the estate was directed to be continued to be held in trust upon certain shares for the benefit of a nephew and a niece of the testator, with contingent remainders.   The trust is still in effect.

At the date of his death the testator owned a number of entire guaranteed mortgages.   Title to nine of the properties, upon which the mortgages were liens, was acquired by the executor either by foreclosure sale or by deed in lieu of foreclosure.   By the decree of this court, dated August 10, 1936, upon an accounting by the executor, the properties so acquired were directed to be transferred by the executor to itself as trustee, as assets of the trust, to be held in separate account by the trustee.   Questions as to the apportionment of the proceeds received upon the ultimate sale of the properties and the respective rights of principal and income beneficiaries in them were reserved for determination by decree in a subsequent accounting proceeding of the trustee.   The trustee has now accounted for the operation of each of these properties.   The account discloses that as to seven of the properties the salvage operations are still unfinished.   The operation of the other two properties is complete, since they were resold prior to the enactment

of section 17-c of the Personal Property Law — one for cash and the other for part cash and part by the execution and delivery of a purchase-money mortgage. No distribution, however, has been made of the proceeds of sale of either of these properties.

The issues raised may be summarized as follows:

*First.* The constitutionality of subdivision 2 of section 17-c of the Personal Property Law (added by Laws of 1940, chap. 452, effective April 13, 1940) which modified, in certain respects, the prior rules in mortgage salvage operations.

*Second.* If constitutionality be sustained, the effect of the terms of that subdivision upon salvage operations falling within its scope.

*Third.* The determination of new questions not arising under section 17-c of the Personal Property Law and not decided specifically by the Court of Appeals in *Matter of Chapal (supra)* and *Matter of Otis (supra)* or by other authorities dealing with mortgage salvage operations.

*First.* In the consideration of the constitutionality of new section 17-c of the Personal Property Law, the prior decisions of the Court of Appeals, the existing situation in trusts, the reasons and conditions which led to its enactment and the terms of the section itself become important. The *Chapal-Otis* rules had, to a great extent, simplified the problem of the trustee, the lawyer and the courts of first instance, in dealing with particular situations developed before them. But complications still remained in salvage operations.

As the economic depression subsequent to 1929 deepened and the value of real properties melted, a waive of foreclosures resulted. Mortgages, which had been regarded in former years as attractive and desirable investments for trust funds, created after foreclosure or acquisition of title complicated and difficult questions with the imposition of burdensome expense to persons interested in trust estates. The complications involved in the computation in a pending or completed salvage operation are emphasized in the pending proceeding where the mathematical analyses and the supporting schedules cover fifty-one closely typed pages of the account. The solution of these problems became the subject of study by members of the bar and particularly by those who were specialists in the law of trusts and estates. In liaison with the executive committee of the Surrogates' Association of our State, intensive investigation was made with the objective of simplification of the rules applying to mortgage salvage operations. Two solutions were immediately presented. The first involved a repeal of the *Chapal-Otis* rules in their entirety, with a recommendation to the Legislature to enact a statute which would treat the foreclosed or acquired real

property as a capital asset in the same manner as ordinary real estate left by a testator. If the foreclosed real estate was thus treated as a capital asset, net income derived from the property would become immediately payable to the life tenant. Upon a sale of the realty, the proceeds would be treated as part of principal. Upon such sale, no allocation between life tenant and remainderman was required. Such was the form of the statutory relief passed by the Legislature of Connecticut. (Pub. Acts [1939], chap. 232.)* The obstacle to the recommendation of the passage of such a sweeping statute, despite the common sense approach which motivated it, was the belief by some of the conferees that if it were applied to mortgage investments made before the effective date of the new statute, it might be subject to the hazards of a determination of unconstitutionality. The second alternative of those who drafted and recommended the passage of the statute by the Legislature was to divide the problem into two parts. The division provided, first, for the abolition of salvage operations as to future investments in mortgages and, second, with the major objective of assisting life tenants, for the modification, within constitutional limits, of the existing law as to investments in mortgages made prior to the effective date of the statutory amendment. That program was ultimately adopted and is embodied in new section 17-c of the Personal Property Law.

Its first subdivision abolished the *Chapal-Otis* rules as to testamentary trusts of persons dying after the effective date of the statute and as to *inter vivos* trusts thereafter established. It likewise was made to apply to mortgage investments made after such effective date in existing trusts, whether testamentary or *inter vivos*. As to such trusts and mortgaged real property the new subdivision stated that the " real property shall be and become a principal asset in lieu of " the mortgage. The " tenant or tenants for life or limited term shall be entitled to the net income from such acquired real property from the date of its acquisition." The rules of procedure under the *Chapal-Otis* decisions were " abolished." Any allocation or apportionment between life tenant and remainderman was prohibited. In the pending proceeding no question has arisen as to the constitutionality of such first subdivision. Indeed, no such question would be tenable since its provisions were wholly prospective in operation.

We now come to the consideration of the terms of the second subdivision of the section, the constitutionality of which is in dispute here. Two relatively simple modifications of the *Chapal-Otis* rules were made in this subdivision. Under those 'rules and particularly under the language of the opinion of Judge LOUGHRAN

---

* Supplement to General Statutes (1939), § 1291e.

in *Matter of Otis* (*supra*), a discretionary power was given to a trustee during a mortgage salvage operation to disburse income to the life tenant, after advances made from principal as an incident to the acquisition of the property had been repaid. It was found, however, that trustees hesitated to make any payment to the life tenant or to exercise the judicial discretion given to them by *Matter of Otis*, because of the fear of a possible surcharge in the event of an overpayment to the life tenant. The life tenant in almost every instance was the primary object of the testator's bounty. The beneficiary intended to be most favored was thus deprived, by the trustee's inaction or hesitancy, of receiving income during the entire salvage period and large sums of money were accumulated and frozen. The injustice to the life tenant was aggravated by the fact that because of the lack of a ready market for the resale of the property, the salvage operation was unduly extended for a long period of years. This situation is emphasized by the facts revealed in the present proceeding. Of the seven mortgages now involved in the salvage operations in which no resale has taken place, the longest period of operation has been six years and two months. The shortest period has been four years and ten months. Thus the average period of operation of all seven mortgages has been approximately five years. In the two completed operations the periods of salvage were two years and six months and two years and eight months. This unhappy situation has been corrected by the new legislation. Trustees are expressly authorized to pay promptly net income derived from the foreclosed or acquired property up to three per centum per annum upon the face amount of the mortgage. From the time of the passage of the new act, it has been the practical experience and observation of the surrogates that hundreds of thousands of dollars which had been theretofore accumulated, were paid out to life tenants upon the authority granted by the statute. Where the trustee had paid the yearly income up to the three per cent maximum to the life tenant, the statute made the payment final. It was specifically stated by the Legislature that such payment up to the maximum was " not subject to recoupment from the life tenant or as a surcharge against the trustee or executor." Moreover, under the new statutory rule, net income up to the maximum of three per cent became payable from the very beginning of the salvage operation, that is, from the date of acquisition by foreclosure or by deed in lieu of foreclosure.

The other amendment to the *Chapal-Otis* rules made by the second subdivision of the new section in the balancing of the equities, furnished protection to the remaindermen interested in the principal of the trust. Excess net income earned in any one

year during the salvage operation above the three per cent maximum payable to the life tenant, was directed to be applied to advancements from principal for arrears of taxes and other liens which accrued prior to the foreclosure or acquisition in lieu of foreclosure and to the cost of capital improvements. Where any balance of unpaid principal advances remained due at the close of the salvage operation, such balance was declared to be " a primary lien upon the proceeds of sale and shall be paid first out of any cash so derived. If insufficient the balance shall be a primary lien upon any purchase money mortgage received upon the sale."

The special guardian of the infant remaindermen has, perhaps, by way of formal objection with a view to a review of this decision by the appellate courts, raised the issue of unconstitutionality. By that procedure it is hoped by all those interested in this program of law reform, that the constitutionality of the new statute will be forever quieted. In essence, therefore, this proceeding is to be regarded as a test case. The special guardian contends that the new statute deprives his wards of property rights and that it is violative of the due process clause of the Fourteenth Amendment of the Federal Constitution and of the similar clause contained in our State Constitution.

His specific attack is based upon the retroactive provisions of the new second subdivision which apply to mortgage investments made previous to its enactment or to salvage operations initiated prior to such enactment. It provides: " The terms and rules of procedure of this subdivision shall apply specifically (a) to the estates of persons dying before its enactment, and (b) to mortgages on real property held by a trustee under a deed of trust or other instrument executed before the date of its enactment, and (c) to real property acquired by foreclosure of mortgage or real property acquired in lieu of foreclosure before or after the date of its enactment in trusts created or mortgage investments made prior thereto, and (d) to any pending proceeding or action for an accounting of the transactions of an executor or trustee." It is claimed that the effect of that subdivision was to take away property from the remainderman in so far as the amounts paid to the life tenant up to the maximum of three per cent per annum might exceed the income allocable to him under the *Chapal-Otis* rules at the close of the mortgage salvage operations.

All of these contentions are overruled. The provisions of the new subdivision are merely remedial, procedural and administrative. The Legislature has done no more in formulating a modification of existing rules than the courts themselves could do and have done within their constitutional powers. In a general sense

the rules as to these salvage operations have been in a fluid state and have never been absolutely or finally fixed by the courts in their application to existing trusts or prior salvage operations. The strongest support for that conclusion is found in the opinion of Judge LOUGHRAN in *Matter of Otis (supra)*. He there stated, " Perhaps it should be added that a general rule for such situations cannot be attained at a bound, that no rule can be final for all cases and that any rule must in the end be shaped by considerations of business policy. Accordingly, we have here put aside inadequate legal analogies in the endeavor to express fair, convenient, practical guides that will be largely automatic in their application. Only the sure result of time will tell how far we have succeeded." (*Matter of Otis, supra,* p. 115.) The " sure result of time " had led the Legislature to make the changes of procedure upon the ground of necessity and advisability by the enactment of the new subdivision. The traditional tests of a statute are the old law, the mischief and the remedy. It is the duty of the courts so to construe the act as to suppress the mischief and advance the remedy. The legislative purpose was declared in the statute itself in subparagraph (d) of subdivision 2 of the section. It reads: " The purpose of the enactment of this subdivision is declared to be the simplification of the rules of procedure in mortgage salvage operations and the elimination of present complications which work to the disadvantage of the life tenant, who is usually the principal object of the testator's or settlor's bounty, by depriving him of a fixed right to the actual payment of any net income earned by the property. Such fixed right is granted in lieu of the discretion now given to the trustee to pay net income or any part thereof to the life tenant. The general rules of the apportionment of the proceeds of sale between life tenant and remainderman are retained subject to the express modifications made herein. Only equitable adjustments and balances as between the parties are intended to be effectuated by the provisions of this subdivision."

The additional reasons which moved the Legislature to modify the existing rules under the *Chapal-Otis* decisions are stated in the explanatory note which was printed in the legislative bill. It is indicative of the intent of the Legislature. It reads in part: " The *Chapal-Otis* rule authorizes the trustee to pay surplus net income in his discretion. Trustees have hesitated to pay such net income because in the case of overpayment to the life tenant, the trustee might be surcharged with that amount. The life tenant of the trust must wait in the majority of cases for a long period of time before he becomes entitled to the payment of any income, because of the present requirement that advances from principal for the

expenses of foreclosure and for arrears of taxes and other liens must first be paid from the net income of the property. The amendment provides for the immediate payment of income to the life tenant beginning with the date of the acquisition of the property by the trustee by foreclosure or conveyance in lieu of foreclosure."

Again, the nature of a salvage operation was described in *Matter of Otis* (*supra*), as a resort to fictions. " Both capital account and income account, as described in the *Chapal* case, are fictions. * * * If, then, the remaindermen are to participate in the apportionment on the feigned basis of unimpaired principal, the share of the life tenant should be computed on the same assumption. The invention of the ' original investment ' is no more valid than the invention of ' unpaid interest ' thereon. Indulgence in both fictions keeps the balance even between the respective parties in interest." Under the " historic fictions " of the English law and the modern fictions which exist under our own law, their ineptness have led to change and improvement by the courts which had to apply them. This very ineptness also constituted an invitation to Parliament in England, and to our own Congress and Legislatures, to alter the fictions, particularly in procedural matters, in order to correct injustice. Fictions, as stated by Professor Gray, were invented and altered " in order that the wine of new law might be put into the bottles of old procedure." (Gray, The Nature and Sources of the Law, p. 34.) The fiction was always capable of modification to meet the needs of modern justice.

Alterations of rules of procedure or administration made by the Legislature or by the courts, do not change substantive rights. Rules of procedure may, therefore, be modified, added to or repealed as the exigencies of the law and particular situations require. " Nor has a person a vested interest in any rule of law entitling him to have the rule remain unaltered." (*Preston Co.* v. *Funkhouser*, 261 N. Y. 140; affd., *sub nom. Funkhouser* v. *J. B. Preston Co.*, 290 U. S. 163, citing *Truax* v. *Corrigan*, 257 id. 312, 348.)

It is claimed that the effect of subdivision 2 of section 17-c was to take away property from the remainderman, in so far as the amount ultimately payable to him on a sale of the real property might be less than the amount which would be payable to him under the rules laid down in *Matter of Chapal* (*supra*) and *Matter of Otis* (*supra*). The possibility that such a situation might result is infinitesimal. Two factors show the extreme improbability of the occurrence of such an event. The customary mortgage interest rate for several years past has been five per cent per annum. The maximum amount payable to the life tenant, under the new statute,

is three per cent. There is, therefore, a margin of safety of two per cent available in the average case in the final computation of allocation to income. Again, a property which would yield three per cent net per annum would, in all probability, produce a selling price sufficient to pay the life tenant, after final apportionment, a sum in excess of what had been paid within the statutory maximum during the period of the salvage operation.

Many remedial rules of procedure or administration have created new rights not theretofore existing, which ultimately benefited one person as against another. The constitutionality of such legislation, even though it were retroactive in its application to existing actions or proceedings or to the estates of those dying before the statutory change was enacted, has been time and again sustained by the courts in the interest of uniformity and justice. As, for example, in *Preston Co.* v. *Funkhouser* (*supra*), our Court of Appeals and the United States Supreme Court upheld, as constitutional, a statute retroactive in scope providing that in any action for the enforcement of or based upon breach of performance of a contract, interest shall be allowed upon the sum awarded, whether theretofore liquidated or unliquidated. In that case the Court of Appeals, through Judge POUND, said: " Every change in the remedies open to parties to a contract does not constitute an impairment of its obligation. Where the statute deals only with the remedy, the creation of a new and more adequate remedy does not impair the obligation of the contract. (*Sackheim* v. *Pigueron*, 215 N. Y. 62.) * * * It follows that section 480 is a remedial statute to be construed, according to its literal meaning, to apply to all actions brought after it went into effect, irrespective of the time when the cause of action arose. It changes an existing right of action rather than creates a new right." The court also pointed out that " the mere fact that the statute is retroactive does not bring it in conflict with the Federal Constitution."

It has always been the recognized function of the courts to promulgate rules of procedure and administration for the guidance of fiduciaries in their conduct of trust estates Such rules have also found expression from time to time by enactment in the various statutes of our State. Examples of remedial statutes modifying or establishing rules of procedure in the administration of existing trusts, where their reasonableness and constitutionality have been sustained, are many. In *Matter of Robertson* v. *de Brulatour* (188 N. Y. 301), after the death of the testator, the Legislature established a new and different rule covering the compensation of trustees. An increased measure of compensation was provided. The trustees were held to be entitled to their benefit and commissions were

allowed to them under the statute in effect at the date of the accounting. In *Matter of Barker* (230 N. Y. 364), commissions for receiving assets were allowed to the estates of deceased executors pursuant to a statute in effect at the date of the accounting but which was not enacted until subsequent to the death of the executors, and necessarily of the testator. In referring to the retroactive effect of the statute, the court there said: " The general rule is that the fees of an executor are to be fixed by the rules and law which prevail at the time when they are settled. (*Robertson* v. *de Brulatour*, 188 N. Y. 301, 316, 317; *Whitehead* v. *Draper*, 132 App. Div. 799.) In the last case this principle was applied in the opinion written by Justice MCLAUGHLIN in a case where the statute invoked in aid of an executor's commissions was not passed until after his death. This is quite akin to the rule that remedies will be applied in accordance with the law which prevails at the time when relief is sought rather than at the time when the injury arose. (*Matter of Berkowitz* v. *Arbib & Houlberg, Inc.*, 230 N. Y. 261.) "

Other instances of remedial statutes may be found in (1) those modifying, after the death of the decedent, the classes of legal securities in which trustees are authorized to invest (*City Bank Farmers Trust Co.* v. *Evans*, 255 App. Div. 135; *Matter of Hamersley*, 152 Misc. 903); (2) the provisions of the Surrogate's Court Act (§§ 225 and 226), providing that an administrator with the will annexed or a successor trustee may exercise powers granted to an executor or trustee to mortgage, lease or sell real property (*Hollenbach* v. *Born*, 238 N. Y. 34); (3) the sections of the Real Property Law authorizing the sale of real property where the interests are both possessory and future (*Matter of Mersereau*, 233 N. Y. 540; *Matter of Gaffers*, 254 App. Div. 448) and (4) the statute granting a creditor of an income beneficiary of a trust the right to require that ten per cent of the income be applied in satisfaction of his claim or debt. (*Brearley School* v *Ward*, 201 N. Y. 358.) The constitutionality of each of these legislative enactments was sustained.

In *Reiner* v. *Fidelity Union Trust Co.* (126 N. J. Eq. 78; 8 A. [2d] 175; revd. on other grounds, 127 N. J. Eq. 377; 13 A. [2d] 291) a statute giving the Court of Chancery of the State of New Jersey power to authorize or direct trustees to invest in securities other than those listed by the statutes as legal for trust investments was upheld as constitutional. The court there said: " The statute does not purport to authorize the court to change substantive rights. It has reference merely to matters of administration."

The extent to which courts have gone to sustain rules of procedure and administration is evidenced by the decision of the United

States Supreme Court in *Kuehner* v. *Irving Trust Co.* (299 U. S. 445). There, the constitutionality of clause (10) of subsection (b) of section 77B of the Bankruptcy Act (U. S. Code, tit. 11, § 207), which limited the claim of a landlord for indemnity under a covenant in a lease in a corporate reorganization to an amount not to exceed three years' rent, was considered. Prior to the passage of this provision of the Bankruptcy Act, such claim was not provable or dischargeable in a bankruptcy proceeding. Under the new statute, the landlord's claim was allowed to the extent of three years' rent only. The rental value for the balance of the term of the lease under the rent fixed by the lease greatly exceeded the three years' rent allowed. It was asserted that this limitation offended the due process clause of the Fifth Amendment of the Constitution of the United States. The validity and constitutionality of the statute were sustained as giving a new and more certain remedy for a limited amount in lieu of an old remedy, insufficient and uncertain in its result. The statute was held to be fair and reasonable and to create uniformity of treatment of a peculiar class of claims, difficult of liquidation. It was held not to be the taking of the landlord's property without due process of law.

As applied to existing trusts, the above authorities clearly support the validity of the remedial legislation enacted in subdivision 2 of section 17-c of the Personal Property Law.

The rules under the subdivision are just, fair and reasonable. Only equitable adjustments and balances as between principal and income beneficiaries were declared to be effectuated by its provisions. It was within the province and power of the Legislature to enact them. The objection of the special guardian, therefore, addressed to the constitutionality of the statute is overruled.

*Second.* Such determination of constitutionality requires the surrogate to pass upon the various questions raised as to the effect of the terms of the new subdivision upon mortgage salvage operations within its scope. These questions are stated and discussed *seriatim* as follows:

(a) Does the section apply to the salvage operation of property acquired by a trustee which was sold before April 13, 1940, the effective date of the statute, where the distribution has not been closed by a decree upon a judicial settlement of the account or by a written or other valid agreement between the parties for a voluntary distribution?

The surrogate holds that where the salvage operation has been completed before the effective date of the new section, its terms do not in any way alter or change the rights of the parties. Once the salvage operation is finished before that date, there remains

nothing to be done except to make the computation of apportionment and to distribute under the *Chapal-Otis* rules. The terms of the statute apply only to uncompleted salvage operations at the date of its enactment or to operations initiated subsequent to such date.

(b) As to operations uncompleted at the effective date of the new section, shall payments to the life beneficiary of net income, when earned, up to a maximum of three per cent per annum upon the face amount of the mortgage be computed upon an annual basis, or shall the entire period of operation, if extending over a period of more than one year, be considered in such computation?

The answer is obvious. The statute clearly contemplates that the net income payments shall be based upon the annual income of the property and not upon the income for the entire period of the unfinished operation. It provides (Pers. Prop. Law, § 17-c, subd. 2, ¶ [a]): " *Net income during the salvage operation up to three per centum per annum upon the principal amount of the mortgage shall be paid to the life tenant* * * *." (Italics mine.) Annual rests and annual balancings of the account must thus be employed and the result of the operation of each parcel of property for each year must be treated as a separate entity in the computation and payment of the maximum net income permitted by the statute to be paid to the life beneficiary. It is an elementary rule in the administration of trusts that the computation of net income payable to a life tenant is based upon the yearly period, unless the terms of the will fix some other period. Any other policy would permit serious prejudice on the part of the trustee as against the life tenant by the withholding of accumulated income.

If, therefore, under this method of computation there are deficits of net income in lean years, they may not be made up from surplus net income in productive years. Income earned in any one year in excess of the three per cent maximum payable to the life beneficiary and after repayment of principal advances, must be retained. Under the new section, principal advances " shall be repaid out of excess net income above such three per centum per annum. When principal advances have been satisfied, any excess income shall be impounded * * * to await sale and apportionment " If the payments of income to the life beneficiary were not based upon annual rests, and the deficiency of net income payments in lean years could be satisfied from excess income in good years, the provision of the statute that such excess income shall be impounded would be nullified.

(c) In the computation of the net income payable to the life beneficiary, shall the fiscal year beginning with the date of the

acquisition of the real property be used or shall the calendar year be employed?

I hold that the anniversary date of the computations of the annual payments to the life beneficiary is the date of the acquisition of the real property and annual rests shall be based upon that date. The period of salvage begins from the date of acquisition of the mortgaged property. (*Matter of Otis, supra.*) The net income payable to the life beneficiary must be computed upon rents received during the fiscal year beginning with that date. It is not based upon rents received during the calendar year. The explanatory note printed in the legislative bill states: " The amendment provides for the immediate payment of income to the life tenant beginning with the date of the acquisition of the property by the trustee by foreclosure or conveyance in lieu of foreclosure." The statute provides that net income shall be paid during the salvage operation. The annual accounts and the computation of the amount due the life tenant at the statutory rate up to three per cent per annum must be based upon the recurring periods of one year from the anniversary dates of acquisition.

(d) Where net rents up to a maximum of three per cent per annum have been paid to a life beneficiary during the period of salvage, has the new section changed the method of apportionment to be made after sale, as laid down by the rules in *Matter of Chapal* (*supra*) and *Matter of Otis* (*supra*)? In other words, has the formula for the allocation, as between income and principal, been changed by the terms of the new section? The surrogate holds that no change was intended by the Legislature.

The new section merely makes mandatory the payments of three per cent of net income each year to a life beneficiary when earned. It does not, however, change the formula for ultimate apportionment of the net proceeds of the salvage operation between life beneficiary and remainderman. Again the new subdivision provides: " The existing rules of procedure applying to salvage operations respecting existing mortgage investments are continued except as modified by the subparagraphs hereinafter set forth." As stated in *Matter of Chapal* (*supra*): " In such an investment situation what is involved is the salvage of a security. The security * * * is a security not for principal alone but for income as well." Paragraph (a) of subdivision 2, with a view to protecting the interests of both life tenant and remainderman in such securities and to impartial and fair apportionment, provides as follows: " The amount of all such payments shall be taken into account, however, in the apportionment of the proceeds of sale and shall be charged against the share of the life tenant." All net income, therefore, including such as had been

paid to the life beneficiary during the salvage period, must be added to the proceeds of sale of the property as the total salvage fund. Out of such total there shall first be deducted the amount required for repayment of principal advancements. The balance then remaining shall be apportioned according to the *Chapal-Otis* formula between income and principal. After the share due the life beneficiary has been computed upon such apportionment, there shall first be credited upon such share the net amount of rents paid to the life beneficiary during the salvage operation as an advancement to income. The amount so paid to the life beneficiary must be " charged against the share of the life tenant " under the new section. The amount apportioned to income, less the income advanced to the life tenant, shall be the balance which the life tenant shall then be paid out of the proceeds of the salvage operation. This method of determining the ultimate shares allocable to income and principal unquestionably, in my opinion, accords with proper accounting practice. (*Matter of Chapal, supra; Matter of Otis, supra; Matter of Brainerd,* [WINGATE, S.] 169 Misc. 640, 644.)

*Third.* The questions presented for determination in this group do not arise out of the provisions of the new section. They involve problems that have not directly been passed upon by the *Chapal-Otis* cases or by other authorities.

(a) Where a trustee has taken over property under foreclosure or by deed in lieu of foreclosure and finds it in such condition as to require rehabilitation, are the expenses incurred to put the property in a tenantable condition exclusively capital charges to be treated as advancements from principal, or are they income charges?

The surrogate holds that where at the time of the acquisition of the real property, the premises were not in rentable condition the cost of putting them into such condition is payable out of principal. The cost of thereafter maintaining the premises in repair and in tenantable condition is payable out of income. Under the new paragraph (a) of subdivision 2, the " cost of all capital improvements " is made a principal charge.

As applied to ordinary trust property where no salvage operation is in effect, the rule seems generally to be well settled that where real property is originally received by the trustee in an untenantable condition, the cost of rehabilitation is chargeable against principal. (Restatement of the Law of Trusts, comment i, § 233; *Stevens* v. *Melcher,* 152 N. Y. 551; *Matter of Deckelmann,* 84 Hun, 476; *Matter of Suydam,* 138 Misc. 873; *Smith* v. *Keteltas,* 62 App. Div. 174; *Matter of Heroy,* 102 Misc. 305.)

In the Restatement of the Law of Trusts the following appears: " The cost of putting into tenantable repair premises which were

not in such repair when received by the trustee, whether originally acquired by the trustee as part of the trust property at the time of the creation of the trust or subsequently acquired by him, is payable out of principal; but the cost of thereafter keeping the premises in repair is payable out of income." The application of this rule to salvage operations would appear to be for the best interests of both life beneficiary and remainderman. Whenever necessary repairs or structural changes are made to put real property in a rentable condition, there inures a benefit to both principal and income beneficiaries. The expenses of rehabilitation, therefore, which are incurred upon the acquisition of the property should be treated as advancements from principal and charged to principal. On the other hand, all expenditures for current repairs and those which are incidental to the management of the property, during the period of the salvage operation, should be charged to income under the general rule laid down in *Matter of Albertson* (113 N. Y. 434). The surrogate sustains the objections of the special guardian to the payment from principal of sums for the current repair and maintenance of the premises, other than the expenses of putting them into tenantable condition at the date of the acquisition of the property. If the parties are able to agree as to the items properly chargeable to income under this determination, a stipulation may be filed within ten days of this decision. If agreement is not reached, the matter will be set down for a further hearing upon this issue.

(b) The further question has been raised as to what is the method of apportioning dividends which may be received in payment, partially or in full, of claims arising out of the guaranty against loss resulting from a defaulted mortgage by an insolvent mortgage guaranty company. Certain sums have been received by the trustee in this estate on claims allowed by the Superintendent of Insurance, as liquidator of the Bond and Mortgage Guarantee Company. All of the properties involved were acquired by foreclosure or by deed in lieu of foreclosure prior to December 31, 1937. The order of liquidation was made and the rights of the parties under the Insurance Law are to be determined as of that date.

The obligation of the Bond and Mortgage Guarantee Company constituted a guaranty as to both interest and principal. The trustee filed proofs of claim with the Superintendent of Insurance. These claims covered the deficit of interest up to December 31, 1937, and the alleged liabilities of the guarantor for restitution of principal losses. In each case the default in interest was allowed by the Superintendent in full. The claims for principal charges were substantially reduced by him.

The surrogate holds that liquidating dividends when received must be treated as part of the general funds developed from the salvage operation. In this sense they are like rents received and the proceeds of sale of the acquired real property. The allocation made by the Superintendent of Insurance as between the guaranty of losses incurred in income and the guaranty of losses incurred in principal is to be treated as tentative only. In addition, all of the parties here conceded that because of the very large liabilities of the guaranty company, the dividends will be relatively small in amount. Moreover, the application of these liquidating dividends should be made as simple as possible.

With this objective in mind the surrogate holds that as to dividends received for income losses from the Superintendent of Insurance, such amounts should be added to the income (derived as rents) during the specific year of the actual receipt of the liquidating dividends. This addition to such rents may still leave a deficit in operation with no *net* rents available for the fiscal year. On the other hand, the addition may wipe out a deficit and produce a net income for such year. In the latter case the moneys become payable within the three per cent maximum to the life tenant. If there be any surplus above the three per cent maximum caused by the addition of these dividends, such surplus shall, under the rule of section 17-c, be applied on account of advances to principal, or if such advances have been satisfied, they shall be retained as part of the general funds of the salvage operation to await sale and final apportionment.

Any dividends received from the Superintendent of Insurance as tentative payments upon principal account shall likewise be retained as part of the general proceeds of the salvage operation to await final sale and apportionment, unless necessary to discharge unpaid balance of principal advancements.

Any dividends which may be received by the trustee on its claim under the guaranty of a mortgage subsequent to the completed salvage of such mortgage, should likewise be apportioned between principal and income in the same ratio as has been applied to the proceeds of sale. They are additional proceeds of the salvage operation.

(c) Where the mortgage was originally guaranteed as to payment of interest and principal by a mortgage guaranty corporation and the guaranty has been canceled by the trustee, because of the insolvency of the corporation, shall the share of the life beneficiary be computed upon the rate fixed in the mortgage or at the rate agreed to be paid by the guaranteeing corporation? In other words, assume an original mortgage was made with six per cent interest. The

corporation has reserved to itself, as the usual charge for the guaranty, one-half of one per cent per annum. The purchaser of the mortgage from the corporation became originally entitled to five and one-half per cent. Where the agency of the guarantor has been canceled, is the share of the life beneficiary to be computed for the duration of the period of salvage at six per cent per annum, the rate set forth in the instrument or at five and one-half per cent?

I hold that the rate of interest fixed in the mortgage taken over by the trustee from the guaranty company is the rate upon which the life beneficiary's interest must be computed. The Court of Appeals in *Matter of Otis* (*supra*) declared the rate of interest as fixed in the mortgage to be the rate to be used as a basis upon which allocation to income was to be made. It said: " We prefer to adhere to our ruling in *Meldon* v. *Devlin* (167 N. Y. 573, affg. 31 App. Div. 146) that interest should be computed at the mortgage rate for the whole period." Although the Court of Appeals in that case did not have before it the exact question here involved, its preference to the adoption of a rule which would fix the mortgage rate upon the cancellation of a guaranty, would appear to be clearly indicated. In view of the determination in *Matter of Otis* (*supra*), it is immaterial that only a yield of five and one-half per cent was guaranteed by the guaranty corporation.

Where, however, prior to acquisition by foreclosure or by deed in lieu of foreclosure, the trustee and the owner of the property have by agreement fixed a rate of interest below the rate prescribed in the mortgage instrument itself, the reduced rate shall be used and not the mortgage rate. Such agreement for reduction of interest, if validly made, is binding upon the parties.

In the present proceeding, the trustee, by letter dated October 22, 1934, agreed to reduce the interest rate in the mortgage on one parcel of real property, 240 Floyd street, Brooklyn, N. Y., from six per cent to four per cent. The interest of the life tenant in the salvage operation must, therefore, be computed at the latter rate from the date of such reduction to the date of sale.

(d) Further questions have been presented as follows:

Where there has been a resale of the foreclosed property and a purchase-money mortgage has been taken back, shall amortization payments under the new mortgage received by the trustee be applied primarily to the discharge of unpaid principal advances for the prior salvage operation, if any are still due? Where principal advances have been entirely repaid, shall amortization payments on the purchase-money mortgage be allocated between life tenant and remainderman as fixed upon apportionment of the proceeds of sale, pursuant to the applicable rules, upon the completion of the prior salvage operation?

The answer to each of these two questions must be in the affirmative. Since unpaid principal advances are a prior lien upon the proceeds of sale of the salvaged property (*Matter of Chapal, supra; Matter of Otis, supra*; Pers. Prop. Law, § 17-c), principal has a prior interest in or lien upon the purchase-money mortgage taken back by the trustee upon the sale. In those circumstances, amortization payments made by the new mortgagor should be credited entirely to principal on account of such prior lien. When the principal advances have been entirely repaid, the amounts received for amortization should be apportioned between principal and income in accordance with the respective shares of each, previously computed and apportioned under the *Chapal-Otis* rule. The interest received by the trustee on the purchase-money mortgage I hold is payable to the life beneficiary. A similar conclusion was reached in *Matter of Martin* (165 Misc. 597).

(e) One further question requires disposition. It is claimed by the income beneficiary that she should be allowed interest at the prevailing rate upon the rents withheld from her by the trustee, which were distributable under section 17-c, from the date of their receipt by the trustee until their payment. The claim is disallowed. The surrogate holds she is entitled to no interest on such rents under the circumstances of this proceeding. In a case where the trustee arbitrarily refuses to pay, interest might be awarded against him for his recalcitrancy and by way of compensation for the detriment suffered by the life tenant.

The objections filed to the account herein are disposed of as follows:

Objections I, II, III, IV, V and VII filed by the special guardian are overruled. Objection VI, relating to the charging of expenditures for repairs, has been the subject of instructions and possible further hearing in the prior portion of this decision.

Objections 5 and 9 of the life beneficiary are overruled. The remaining objections filed by her are sustained to the extent of directing the necessary readjustments to be made in the account to comply with the conclusions of the surrogate contained in this decision.

Submit decree on notice settling the account in accordance with this decision and with the prior decision construing the will (175 Misc. 1042) made in this proceeding.