## DEMOREST ET AL. *v.* CITY BANK FARMERS TRUST CO., TRUSTEE, ET AL.

NO. 52.

Argued December 10, 1943.—Decided January 17, 1944.

*Mr. Francis J. Mahoney,* with whom *Mr. Gerald P. Culkin* was of counsel, for appellants in No. 52; and *Mr. James N. Vaughan,* with whom *Mr. Thomas B. Dyett* was on the brief, and *Mr. Edward G. Griffin* was of counsel, for appellant in No. 227.

*Mr. C. Alexander Capron,* with whom *Mr. Charles Angulo* was of counsel, for the City Bank Farmers Trust Co., Trustee; and *Mr. Albert Stickney* for Emma M. West,—appellees in No. 52. *Mr. Louis J. Merrell* for appellees in No. 227.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Appellants in these two cases challenge the constitutionality of Subdivision 2 of § 17–c of the Personal Property Law of the State of New York, approved April 13, 1940.[1]

---

[1] N. Y. Laws 1940, c. 452, p. 1182. The subsection provides:

"2. The existing rules of procedure applying to salvage operations respecting existing mortgage investments are continued except as modified by the subparagraphs hereinafter set forth. The terms and rules of procedure of this subdivision shall apply specifically (a) to the estates of persons dying before its enactment and (b) to mortgages on real property held by a trustee under a deed of trust or other instrument executed before the date of its enactment and (c) to real property acquired by foreclosure of mortgage or real property acquired in lieu of foreclosure before or after the date of its enactment in trusts created or mortgage investments made prior thereto, and (d) to any pending proceeding or action for an accounting of the transactions of an executor or trustee.

"(a) Net income during the salvage operation up to three per centum per annum upon the principal amount of the mortgage shall be paid to the life tenant, regardless of principal advances for the expenses of foreclosure or of conveyance in lieu of foreclosure and

**38**

Because of retroactivity it is said to offend the Due Process Clause of the Fourteenth Amendment to the Federal Constitution by taking for benefit of income beneficiaries property to which the appellants as beneficiaries of principal

arrears of taxes and other liens which occurred prior to such foreclosure or conveyance and the cost of all capital improvements. Any payment of net income heretofore or hereafter made to the life tenant up to such three per centum per annum shall be final and shall be not subject to recoupment from the life tenant or as a surcharge against the trustee or executor. The amount of all such payments shall be taken into account, however, in the apportionment of the proceeds of sale and shall be charged against the share of the life tenant.

"(b) The foregoing principal advances shall be repaid out of excess net income above such three per centum per annum. When principal advances have been satisfied, any excess income shall be impounded (subject to reinvestment under the terms of the will or deed) to await sale and apportionment.

"(c) The unpaid principal advances shall be a primary lien upon the proceeds of sale and shall be paid first out of any cash so derived. If insufficient the balance shall be a primary lien upon any purchase money mortgage received upon the sale.

"(d) The purpose of the enactment of this subdivision is declared to be the simplification of the rules of procedure in mortgage salvage operations and the elimination of present complications which work to the disadvantage of the life tenant, who is usually the principal object of the testator's or settlor's bounty, by depriving him of a fixed right to the actual payment of any net income earned by the property. Such fixed right is granted in lieu of the discretion now given to the trustee to pay net income or any part thereof to the life tenant. The general rules of the apportionment of the proceeds of sale between life tenant and remainderman are retained subject to the express modifications made herein. Only equitable adjustments and balances as between the parties are intended to be effectuated by the provisions of this subdivision. If any provision of this subdivision or the application thereof to any mortgage or acquired property by foreclosure or conveyance, or to any trust is held invalid, the remainder of the subdivision and the application of such provision to any other mortgage or property acquired by foreclosure or conveyance or other trust shall not be affected thereby."

claim vested rights.   It is asserted, also, to deny equal protection of the laws.

The facts in No. 52 are these: Henry West died in 1934. His will, so far as concerns us, left a residuary estate in trust.   Net income less certain payments to a brother was given to his wife during her life or widowhood.   Thereafter, subject to certain further trusts, the residue was to go to contingent remaindermen, among whom are the appellants.

At death West owned a number of mortgages.   Owing to defaults, titles to nine of the underlying properties were acquired either by foreclosure sale or by deed in lieu thereof, and held in separate accounts as assets of the trust. The trustee's accounting disclosed that two such salvage operations were completed by sale of the properties prior to the enactment of § 17–c of the Personal Property Law. No distribution had been made of the proceeds.   Objections on behalf of remaindermen questioned the validity of the statute as applied to apportioning such proceeds between income and principal.   Surrogate Foley, however, upheld the statute and resolved the apportionment under its terms.   His decree was unanimously affirmed by the Appellate Division of the Supreme Court for the First Judicial Department and thereafter was affirmed by the Court of Appeals, two judges dissenting.   *Matter of West,* 289 N. Y. 423, 46 N. E. 2d 501.   The case is brought here by appeal.

In No. 227, Auguste Schnitzler died in 1930, leaving a will which put her residuary estate in trust with the income payable to a sister for life.   The income beneficiary died in 1939.   Salvage operations had begun in the lifetime of the beneficiary and were completed after her death.   Surrogate Delehanty found that operation of the statute "resulted over the whole salvage period in taking for income account more than the whole of what the property earned in that period.   The deficit in so-called

'income' was made up by taking principal, of course."
He considered the result "startling" but settled the accounts under the statute, leaving its validity to be determined by appellate courts. The Court of Appeals affirmed without opinion on the authority of *Matter of West* and the case comes here by appeal.

The grievance of remaindermen in these cases is not that they have suffered loss or deprivation of any specific property to which they had legal title. Under the law of New York the whole legal estate vests in the trustee for purposes of the trust,[2] including title to mortgages and to real estate acquired upon or in lieu of their foreclosure, which becomes personalty for the purposes of the trust.[3] Where the instrument creating the trust directs payment of income to one set of beneficiaries and corpus to another, allocation of receipts and disbursements as between capital and income is sometimes attended with difficulty. Mortgage investments may be imperiled by default in interest only, or payments of principal alone, or of both, but in either event both income and capital interests require protection. Advancements often must be made to remove tax liens or other prior charges, pay costs of foreclosure, make property tenantable, or take care of operating losses, watchmen, or insurance. On final sale the price, together with rentals, may leave either a loss or a profit, and to forego income for a period may result in a better sale of the capital asset. The variety of circumstances under which trustees are called upon to allocate items between capital and income are innumerable in salvage operations, the will rarely provides guidance, and the wisest and most faithful trustee is unable to draw the line with any great assurance. Either the income beneficiary

---

[2] *Knox* v. *Jones,* 47 N. Y. 389; *Bennett* v. *Garlock,* 79 N. Y. 302. Cf. 1 Scott on Trusts, p. 3.

[3] *Lockman* v. *Reilly,* 95 N. Y. 64.

or the remaindermen may challenge his accounts, for they have equitable interests which chancery will enforce that the trust be administered diligently and faithfully according to the will and the law. The flood of issues as to allotment of receipts and disbursements to capital or income account, following the depression, led the Court of Appeals to attempt to clarify the chancery rules on the subject for better guidance of trustees and the courts that supervise them.[4] When this was only partially successful, the problem of clarification was carried further by legislation. The remaindermen claim an unconstitutional taking of their property results from this legislative enactment of rules for distribution as between income and capital beneficiaries of trust property involved in salvage operations, because they are less favorable to the remainder interests in these cases than the rules they claim otherwise would have applied.

Appellants' contention is that the New York Court of Appeals established a rule of apportionment of proceeds of salvage operations of mortgaged property as between income and principal which became a settled rule of property under which property rights vested in them prior to accounting by the trustees. This, they say, was accomplished by the decisions in *Matter of Chapal*, 269 N. Y. 464, 199 N. E. 762 (1936), and *Matter of Otis*, 276 N. Y. 101, 11 N. E. 2d 556 (1937). The Court of Appeals, however, in one of the present cases holds to the contrary, saying that those opinions represent tentative judicial efforts to guide the discretion of trustees; that they did not establish rules of property; and that the legislature appears to have done no more than to direct trustees to do what they already had discretion to do, in which case

[4] In New York, power to "direct and control the conduct, and settle the accounts" of trustees is allotted to the Surrogate's Court. Surrogate's Court Act § 40 (3).

remaindermen could not have insisted upon their being surcharged under the law before the enactment.

In thus rejecting appellants' version of its previous decisions the Court of Appeals disposed of their cases on the ground that appellants have never possessed under New York law such a property right as they claim has been taken from them. If this is the case, appellants have no question for us under the Due Process Clause. Decisions of this Court as to its province in such circumstances were summarized in *Broad River Power Co.* v. *South Carolina,* 281 U. S. 537, 540, as follows: "Whether the state court has denied to rights asserted under local law the protection which the Constitution guarantees is a question upon which the petitioners are entitled to invoke the judgment of this Court. Even though the constitutional protection invoked be denied on non-federal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair or substantial basis. If unsubstantial, constitutional obligations may not be thus evaded. But if there is no evasion of the constitutional issue, and the non-federal ground of decision has fair support, this Court will not inquire whether the rule applied by the state court is right or wrong, or substitute its own view of what should be deemed the better rule, for that of the state court." [5]

Despite difference of opinion within the Court of Appeals as to the effect of its earlier cases, we think that the decision of the majority that they did not amount to a

---

[5] See same case on rehearing, 282 U. S. 187, and *Sauer* v. *New York,* 206 U. S. 536, 546; *Leathe* v. *Thomas,* 207 U. S. 93; *Vandalia R. Co.* v. *Indiana,* 207 U. S. 359, 367; *Enterprise Irrigation Dist.* v. *Farmers Mutual Canal Co.,* 243 U. S. 157, 164; *Ward* v. *Love County,* 253 U. S. 17, 22; *Fox River Paper Co.* v. *Railroad Commission,* 274 U. S. 651, 655. Compare *United Fuel Gas Co.* v. *Railroad Commission,* 278 U. S. 300, 307; *Risty* v. *Chicago, R. I. & P. Ry. Co.,* 270 U. S. 378, 387.

rule of property does rest on a fair and substantial basis. The opinion in the *Otis* case had indicated a tentative quality in its pronouncements, saying: "Perhaps it should be added that a general rule for such situations cannot be attained at a bound, that no rule can be final for all cases and that any rule must in the end be shaped by considerations of business policy. Accordingly, we have here put aside inadequate legal analogies in the endeavor to express fair, convenient, practical guides that will be largely automatic in their application. Only the sure result of time will tell how far we have succeeded." And the opinion had pointed out that the disbursement of net income during salvage operations was left to the discretion of the trustee with the admonition that the discretion "should be exercised with appropriate regard for the fact that unless a life tenant gets cash he does not get anything in the here and now." 276 N. Y. 101, 115.

The executive committee of the Surrogates' Association of the State of New York, composed of the judicial officers immediately charged with application of these decisions to the instruction of and accountings by trustees held a similar view of the discretion left to trustees. The legislature appears to have been of the same mind in adopting the new legislation.[6] The judicial effort was

---

[6] When it was introduced into the legislature, the bill proposing § 17–c carried the following explanatory note by the Surrogates' Association:

"This amendment is proposed by the executive committee of the Surrogates' Association of the state of New York. Its general purposes are:

"(1) To simplify the complicated rules restated in Matter of Chapal (269 N. Y. 464) and in Matter of Otis (276 N. Y. 101) relating to mortgage salvage operations (a) in existing trusts as to mortgages hereafter acquired as a trust investment and (b) in testamentary trusts created by the will of decedent dying after its enactment and (c) in *inter vivos* trusts created by an instrument executed after its

to formulate general rules to guide fiduciary discretion. The *Chapal* decision was rendered in response to a trustee's petition for instructions. But while such decisions were useful as precedents, they were felt not adequate to

enactment. Such simplification is provided in the first subdivision of the new section.

"In recent years section 17–a of the Personal Property law was enacted to avoid the difficult problems of the allocation of stock dividends received during the period of a trust. Under that section they are now allocated wholly to capital. Section 17–b of the Personal Property law was enacted to abolish the intricate rule in Matter of Benson (96 N. Y. 499) under which it was necessary to capitalize the income on monies held within the estate for the payment of administration expenses, debts, taxes and pecuniary legacies. In line with this policy the proposed legislation contained in the first subdivision abolishes, in the instances stated above, the Chapal-Otis rules, and will substitute a simple form of the treatment of the foreclosed real property as a principal asset of the trust. It is to be treated just as a railroad bond upon which default in interest before sale has occurred.

"(2) Further modifications are proposed by the second subdivision of the section as to mortgage investments already made in existing trusts. The present rules for apportionment between life tenant and remainderman under the Chapal-Otis cases are continued as to existing trusts where the investment in a mortgage has been made, with modification thereof in two specific instances.

"(a) The Chapal-Otis rule authorizes the trustee to pay surplus net income in his discretion. Trustees have hesitated to pay such net income because in the case of overpayment to the life tenant, the trustee might be surcharged with that amount. The life tenant of the trust must wait in the majority of cases for a long period of time before he becomes entitled to the payment of any income, because of the present requirement that advances from principal for the expenses of foreclosure and for arrears of taxes and other liens must first be paid from the net income of the property. The amendment provides for the immediate payment of income to the life tenant beginning with the date of the acquisition of the property by the trustee by foreclosure or conveyance in lieu of foreclosure. Under the new provisions net income up to three per centum of the face amount of the mortgage is so payable. Under the Chapal-Otis rules the life tenant is entitled in the final apportionment to the inclusion of interest at the mortgage rate during the period of the salvage opera-

protect trustees against the hazards of litigation in particular cases, and the avowed effort of the court to adapt the law to the situation resulting from the depression failed in practice.[7]   Hence the legislature intervened,

tion.   The rate of three per centum in the new section has been recommended as a fair return to the life tenant and at the same time a protection to the remainderman in the event that the property is sold at less than the face amounts of the income and principal shares employed at the ratio of the apportionment.   (b) Surplus net income above three per centum is to be applied to the payment of advances from principal until the amount of such advances are satisfied. When the property in the salvage operation is sold, the unpaid balance of principal advances must be satisfied first out of the cash received from the sale.   If there be any unpaid balance due for principal advances, it is made a primary lien upon the purchase money mortgage.   The amendment further directs that after principal advances have been paid, the surplus net income above three per centum, accruing during the salvage operation, shall be held by the trustee to await sale and apportionment under the Chapal-Otis rules."   N. Y. Laws 1940, p. 1181.

[7] Surrogate Foley in the *Demorest* case states the effect of this Act as follows (*Matter of West*, 175 Misc. 1044, 1048, 26 N. Y. S. 2d 622) :

"Two relatively simple modifications of the *Chapal-Otis* rules were made in this subdivision.   Under those rules and particularly under the language of the opinion of Judge Loughran in *Matter of Otis* (*supra*), a discretionary power was given to a trustee during a mortgage salvage operation to disburse income to the life tenant, after advances made from principal as an incident to the acquisition of the property had been repaid.   It was found, however, that trustees hesitated to make any payment to the life tenant or to exercise the judicial discretion given to them by *Matter of Otis*, because of the fear of a possible surcharge in the event of an overpayment to the life tenant.   The life tenant in almost every instance was the primary object of the testator's bounty.   The beneficiary intended to be most favored was thus deprived, by the trustee's inaction or hesitancy, of receiving income during the entire salvage period and large sums of money were accumulated and frozen.   The injustice to the life tenant was aggravated by the fact that because of the lack of a ready market for the resale of the property, the salvage operation was unduly extended for a long period of years.   This situation is emphasized by the facts revealed in the present proceeding.   Of the seven

adopted a rule which the trustee might have applied before, in its discretion, and prescribed it as a definite standard for setting apart income, protecting trustees against liability to remaindermen if they followed it.   What ap-

mortgages now involved in the salvage operations in which no resale has taken place, the longest period of operation has been six years and two months.   The shortest period has been four years and ten months.   Thus the average period of operation of all seven mortgages has been approximately five years.   In the two completed operations the periods of salvage were two years and six months and two years and eight months.   This unhappy situation has been corrected by the new legislation.   Trustees are expressly authorized to pay promptly net income derived from the foreclosed or acquired property up to three per centum per annum upon the face amount of the mortgage.   From the time of the passage of the new act, it has been the practical experience and observation of the surrogates that hundreds of thousands of dollars which had been theretofore accumulated, were paid out to life tenants upon the authority granted by the statute.   Where the trustee had paid the yearly income up to the three per cent maximum to the life tenant, the statute made the payment final.   It was specifically stated by the Legislature that such payment up to the maximum was 'not subject to recoupment from the life tenant or as a surcharge against the trustee or executor.'   Moreover, under the new statutory rule, net income up to the maximum of three per cent became payable from the very beginning of the salvage operation, that is, from the date of acquisition by foreclosure or by deed in lieu of foreclosure.

"The other amendment to the *Chapal-Otis* rules made by the second subdivision of the new section in the balancing of the equities, furnished protection to the remaindermen interested in the principal of the trust.   Excess net income earned in any one year during the salvage operation above the three per cent maximum payable to the life tenant, was directed to be applied to advancements from principal for arrears of taxes and other liens which accrued prior to the foreclosure or acquisition in lieu of foreclosure and to the cost of capital improvements.   Where any balance of unpaid principal advances remained due at the close of the salvage operation, such balance was declared to be 'a primary lien upon the proceeds of sale and shall be paid first out of any cash so derived.   If insufficient the balance shall be a primary lien upon any purchase money mortgage received upon the sale.' "

pears really to have been taken from the remainderman is his right to question the equity of the rule in his individual circumstances, a right which he had while it was a rule of the court. In the case of the *Schnitzler* trusts where the rule results in invasion of the remainderman's principal to make good to the life beneficiary the statutory allowance of income, Surrogate Delehanty implied, and no one has denied, that the flexibility of the former rule would probably have resulted in a surcharge of the trustee's accounts, and hence that the remainderman has been deprived of the value which benefit of the *Chapal-Otis* rule would likely add to his remainder. Of course the very purpose of the statute, as Surrogate Foley points out, is to deprive him of that objection to the accounts, to protect the trustee against that hazard, and to give the remainderman other compensatory advantages. The legislature has furthered certainty at cost of flexibility.

Constitutional validity of this legislation if it had been made applicable to estates of decedents dying after its enactment is not questioned. It is objected only that application to an estate whose administration began before the Act so as to take away the remainderman's right to judicial examination of the trustee's computation of income makes it void for retroactivity.

It may be observed that insofar as appellants stand on the *Chapal-Otis* rule it can benefit them only if it may be retroactive. Both of these decedents died several years before either of those decisions. If a property right to some particular rule of income allotment in salvage proceeds vested at all, it would seem to have done so at death of the testator. If so, remaindermen would have to show that their property right was established by decisions then in existence, or else that advantages derived from a later judicial decision may not be repealed. The case comes to this: Appellants took remainders at a time when the rules by which to sequester their interests in proceeds from

complicated operations to salvage property were so indefinite that several years later the Court made an effort to devise more definitive rules for the purpose. They were but partly successful, and a few years later the legislature made further and perhaps more authoritative and final rules. Comparing the later with the earlier effort, the remainderman in these particular cases finds himself prejudiced. He says we must confirm him in the earlier by striking down the later of two retroactive rules of law.

This statute does not purport to open accountings already closed or to take away rights or remainders judicially settled under the old rule. The statute is applied only to judicial settlements pending at or instituted after its enactment. Rights to succession by will are created by the state and may be limited, conditioned, or abolished by it. *Irving Trust Co.* v. *Day,* 314 U. S. 556. The whole cluster of vexatious problems arising from uses and trusts, mortmain, the rule against perpetuities, and testamentary directions for accumulations or for suspensions of the power of alienation, is one whose history admonishes against unnecessary rigidity. The state may extend the testamentary privilege on terms which permit tying up of property in trust for possibly long periods. But the state on creation of such a trust does not lose power to devise new and reasonable directions to the trustee to meet new conditions arising during its administration, such as the depression presented to trusts holding mortgages. Cf. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398. Nothing in the Federal Constitution would warrant us in holding that judicial rules tentatively put forward and leaving much to discretion will deprive the legislature of power to make further reasonable rules which in its opinion will expedite and make more equi-

table the distribution of millions of dollars of property locked in testamentary trusts, even if they do affect the values of various interests and expectancies under the trust. The Fourteenth Amendment does not invalidate the Act in question.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs:

The New York Court of Appeals stated that in formulating the statutory rule in question the state legislature did no more "than direct a trustee to do what under the decisions of this court he has discretionary power to do." 289 N. Y. 423, 430, 46 N. E. 2d 501. And it went on to say, "Before the enactment of this statute, the life tenant could not have demanded as of right the payment to him during liquidation of more of the surplus income than he will receive under the statute. Neither does it appear that the remaindermen could properly have insisted that the trustee should be surcharged if in the exercise of his discretion he had paid to the life tenant the amount which the statute now directs." *Id.* That is a question of New York law on which the New York court has the final say. It is none of our business—whether we deem that interpretation to be reasonable or unreasonable, sound or erroneous. *Sauer* v. *New York,* 206 U. S. 536, 545–548. And there is no suggestion here that state law has been manipulated in evasion of a federal constitutional right. *Fox River Paper Co.* v. *Railroad Commission,* 274 U. S. 651, 657; *Broad River Power Co.* v. *South Carolina,* 281 U. S. 537, 540. Consequently I can see no possible claim to substantiality of any federal question, whatever view may be taken of the due process clause. I would therefore dismiss the appeal.