In the Matter of the Estate of HENRY C. WEST, Deceased. WILLIAM J. DEMOREST, JR., et al., Appellants.

CITY BANK FARMERS TRUST COMPANY, as Trustee, et al., Respondents.

Argued June 5, 1942; decided January 14, 1943.

*Francis J. Mahoney* for Gerald P. Culkin, as special guardian for William J. Demorest, Jr., et al., infants, appellants. Subdivision 2 of section 17-c of the Personal Property Law (Cons. Laws, ch. 41) is unconstitutional because it is retrospective and deprives the remaindermen of vested rights without due process of law. (*Morris* v. *Sickly,* 133 N. Y. 456; *Matter of Rowland,* 273 N. Y. 100; *Matter of People* [*Title & Mortgage Guarantee Co.*], 264 N. Y. 69; *Lytle* v. *Beveridge,* 58 N. Y. 592; *Matter of Albertson,* 113 N. Y. 434; *Matter of Jackson,* 258 N. Y. 281; *Matter of Otis,* 276 N. Y. 101; 277 N. Y. 650; *Matter of Chapal,* 269 N. Y. 464; *Matter of McManus,* 282 N. Y. 420; *New York & Oswego M. R. R. Co.* v. *Van Horn,* 57 N. Y. 473; *Matter of Pell,* 171 N. Y. 48; *Matter of Lansing,* 182 N. Y. 238; *Westervelt* v. *Gregg,* 12 N. Y. 202; *Ætna Life Ins. Co.* v. *Hoppin,* 214 Fed. 928; *City of Rochester* v. *West,* 164 N. Y. 510; *Matter of Wacht,* N. Y. L. J., January 14, 1942.)

Where the property was resold by the trustee prior to the effective date of the statute the salvage operation was completed and the statute is inapplicable.

*Albert Stickney* and *Albert B. Maginnes* for Emma M. West, appellant and respondent. Subdivision 2 of section 17-c purports to revise the rules of equitable apportionment between life tenant and remainderman of the proceeds of a salvage operation. Remainder interests in a trust have no right either by common law or by statute to have the income from a trust investment appropriated to the repayment of advances made out of principal for the protection of the investment, and such an appropriation constitutes an accumulation of income offensive to the public policy of this State. (*Munn* v. *Illinois*, 94 U. S. 113; *Hascall* v. *King*, 162 N. Y. 134; *Thorn* v. *De Breteuil*, 179 N. Y. 64; *Matter of Martin*, 165 Misc. 597; *Matter of Pitney*, 113 App. Div. 845; 186 N. Y. 540; *Matter of Phelps*, 162 Misc. 703; *Matter of Chapal*, 269 N. Y. 464; *Matter of Otis*, 276 N. Y. 101; *Meldon* v. *Devlin*, 31 App. Div. 146; 167 N. Y. 573; *Matter of Marshall*, 43 Misc. 238; *Matter of Hood*, 90 N. Y. 512; *Matter of Baker*, 249 App. Div. 265; *Matter of McManus*, 282 N. Y. 420; *Lockman* v. *Reilly*, 95 N. Y. 64; *Haberman* v. *Baker*, 128 N. Y. 253.) It is within the power of the Legislature to enact laws changing the rules governing the administration and distribution of trust funds provided such changes are in the public interest, and are not arbitrary or unreasonable. The fact that section 17-c operates retroactively to change the previously existing rule, by giving the life beneficiary of a trust the right to the payment of a reasonable share of the net income earned during the continuance of a salvage operation, and postponing repayment of principal advances until its final liquidation, does not deprive remaindermen of any property right without due process of law, within the meaning either of the Federal or State Constitutions. (*Kuehner* v. *Irving Trust Co.*, 299 U. S. 445; *City Bank Farmers Trust Co.* v. *Irving Trust Co.*, 299 U. S. 433; *Thompson* v. *Siratt*, 95 Fed. [2d] 214; *Munn* v. *Illinois*, 94 U. S. 113; *N. Y. C. R. R. Co.* v. *White*, 243 U. S. 188; *Carpenter* v. *Wabash Ry. Co.*, 309 U. S. 23; *Preston Co.* v. *Funkhouser*, 261 N. Y. 140; 290 U. S. 163; *Matter of Kaplan* v. *Peyser*, 273 N. Y.

147; *Carder Realty Corp.* v. *State,* 172 Misc. 498; *Brearley School* v. *Ward,* 201 N. Y. 358.) The life beneficiary appeals from so much of the order affirming the decree as denies retroactive operation of the statute to the salvage operations conducted with respect to property, in which upon resale of the real estate the trustee was obliged to take back a purchase money mortgage in part payment of the purchase price. The liquidation of the investment is incomplete, and the salvage operation necessarily continues until a secondary liquidation has been accomplished. (*Matter of Martin,* 165 Misc. 597.)

*C. Alexander Capron* and *J. Karr Taylor* for City Bank Farmers Trust Company, as trustee, respondent. The statute is constitutional. It deprives neither the life beneficiary nor the remaindermen of any property. (*Lockman* v. *Reilly,* 95 N. Y. 64; *Preston Co.* v. *Funkhouser,* 261 N. Y. 140; 290 U. S. 163; *Carpenter* v. *Wabash Ry. Co.,* 309 U. S. 23; *Matter of Union Trust Co.* [*Hoffman Estate*], 219 N. Y. 514; *City Bank Farmers Trust Co.* v. *Evans,* 255 App. Div. 135; *Dakin* v. *Demming,* 6 Paige Ch. 95; *Robertson* v. *deBrulatour,* 188 N. Y. 301; *Matter of Potter,* 106 Misc. 113; *Matter of Chapal,* 269 N. Y. 464; *Matter of Otis,* 276 N. Y. 101; *Meldon* v. *Devlin,* 31 App. Div. 146; 167 N. Y. 573; *Matter of Marshall,* 43 Misc. 238; *Matter of Nirdlinger,* 327 Penn. St. 171; *Lawrence* v. *Littlefield,* 215 N. Y. 561; *United States* v. *Standard Oil Co.,* 20 Fed. Supp. 427; 107 F. [2d] 402; *Brearley School* v. *Ward,* 201 N. Y. 358.) The express provision of the statute that it shall apply " to any pending proceeding or action for an accounting of the transaction of an executor or trustee " is constitutional as applied to the existing case. (*New York & Oswego M. R. R. Co.* v. *Van Horn,* 57 N. Y. 473.)

FINCH, J. The question presented for decision is the constitutionality and construction of the provisions of subdivision 2 of section 17-c of the Personal Property Law (L. 1940, ch. 452, effective April 13, 1940; Cons. Laws, ch. 41) in so far as the same modify retroactively the rules relating to mortgage salvage operations.

The new statutory rules allot to the life tenant out of the net income earned from the operation of real estate in salvage, an annual

amount up to three per cent of the face value of the mortgage investment. Such right is granted in lieu of the discretion vested in the trustee under the heretofore existing rules of trust administration to pay net income or any portion thereof to the life tenant, a discretion which has not been exercised generally by trustees through fear of possible surcharge. Such payment of net income is made payable from the beginning of the salvage operation and is declared to be final and not subject to recoupment, either from the life tenant, or from the trustee or executor by way of surcharge. With the exception of the aforesaid modification, the previously existing rules governing salvage operations are continued except that annual net income in excess of the maximum sum payable to the life beneficiary, is directed to be held and further equitable adjustments upon the apportionment are also provided 'for, in order to insure to the remainderman that any unpaid advances from principal must be first repaid upon the final liquidation of the investment.

The validity of this statute has been put in issue upon this proceeding for an intermediate accounting by the trustee under the will of Henry C. West. By the terms of the testator's will, his residuary estate was devised to a trustee to apply the net income therefrom to the use of his wife during her life or until her remarriage. Upon the termination of the life estate, the trust was directed to be divided and continued upon certain shares for the benefit of a nephew and niece of the testator, with remainders over.

At the time of his death in 1934, the testator's residuary estate included, among various other assets, certain wholly owned guaranteed mortgages. Nine of these mortgages went into default after the death of the testator, and the estate acquired title to the real properties either by foreclosure or by deed in lieu of foreclosure prior to April 13, 1940; two of the properties were sold before that date, the income and proceeds therefrom, however, being retained in the hands of the trustee.

In the present proceeding the special guardian for the infant remaindermen contends, first, that the entire subdivision 2 of section 17-c is unconstitutional because it is expressly made retroactive in operation, and that, second, if constitutional, it does not apply, as a matter of construction, to the proceeds of the two properties which were sold before the statute became effective.

The learned Surrogate sustained the constitutionality of the statute, but held as a matter of construction that it applied only to salvage operations uncompleted at the date of its enactment and hence was inapplicable to the two properties sold before it became effective. Upon appeal, the Appellate Division unanimously affirmed.

When a mortgage in default is foreclosed and title to the property is acquired by the trustee, the original mortgage investment is at an end and a salvage operation is initiated. (*Matter of Otis*, 276 N. Y. 101, 111, 112.) The real property thus acquired is substituted for the mortgage in the hands of the trustee and takes on the character of personalty. (*Lockman* v. *Reilly*, 95 N. Y. 64, 71.) The trustee holds this real property so acquired and must administer it as an asset of the trust estate for the benefit of the life tenant and the remaindermen. Like the mortgage, it is " security not for principal alone but for income as well." (*Matter of Chapal*, 269 N. Y. 464, 472.) With respect to the mortgages which the testator owned at the time of his death and with respect to any real property which might be acquired by the trustee following default in any of these mortgages, the testator as creator of the trust gave no express directions except the general direction of what is commonly understood by the use of the words " income " and " principal." After the initiation of the salvage operation, as before, both the life tenant and the remaindermen could compel the trustee to administer the trust and to apportion to each his just share of the income and principal, but not that of any particular asset of the trust. (*Lockman* v. *Reilly*, 95 N. Y. 64, 71; *Bennett* v. *Garlock*, 79 N. Y. 302, 320.) Although the rule requiring apportionment as between income and principal, of the proceeds of such sale has been long established (*Meldon* v. *Devlin*, 31 App. Div. 146; affd., 167 N. Y. 573), the rules relating specifically to mortgage salvage operations were speeded in the process of formulation by the courts with the coming of the economic depression of the 1930's. In *Matter of Chapal* (269 N. Y. 464) this court said: " We have another problem — that of the liquidation of real estate acquired of necessity because of default on a mortgage investment." Concerning these rules thus worked out to meet the emergency resulting from widespread foreclosures, in *Matter of Otis, supra,* at page 112, we said:

" Both capital account and income account, as described in the *Chapal* case, are fictions * * *. If, then, the remaindermen are to participate in the apportionment on the feigned basis of unimpaired principal, the share of the life tenant should be computed on the same assumption. The invention of the ' original investment' is no more valid than the invention of ' unpaid interest' thereon. Indulgence in both fictions keeps the balance even between the respective parties in interest."

Moreover, we expressly said in the *Otis* case that the rules laid down were tentative only and not intended to be final. At page 115 it was said: " Perhaps it should be added that a general rule for such situations cannot be attained at a bound, that no rule can be final for all cases and that any rule must in the end be shaped by considerations of business policy. Accordingly, we have here put aside inadequate legal analogies in the endeavor to express fair, convenient, practical guides that will be largely automatic in their application. Only the sure result of time will tell how far we have succeeded." It was also carefully pointed out that no hard and fast rule was laid down to guide the trustee in the disposition of net income earned during the salvage operation, but the disbursement of net income to the life beneficiary was left to the discretion of the trustee. In the *Otis* case we said at page 115: " * * * the trustee may distribute such surplus income in its discretion. (269 N. Y. at p. 470). This discretion, moreover, should be exercised with appropriate regard for the fact that unless a life tenant gets cash he does not get anything in the here and now."

The Legislature has found, however, that trustees through fear of surcharge have accumulated surplus with the result that undue hardship has been visited upon life beneficiaries. Taking heed of this hardship at the request of the executive committee of the Surrogate's Association of the State of New York, the Legislature has declared its purposes in the statute itself. In part it reads: " The purpose of the enactment of this subdivision is declared to be the simplification of the rules of procedure in mortgage salvage operations and the elimination of present complications which work to the disadvantage of the life tenant * * * by depriving him of a fixed right to the actual payment of any net income earned by the property. Such fixed right is granted in lieu of

the discretion now given to the trustee to pay net income or any part thereof to the life tenant. * * * Only equitable adjustments and balances as between the parties are intended to be effectuated by the provisions of this subdivision." Thus the Legislature has substituted in place of the discretion in the trustee permitting disbursement of surplus income, another more definite rule requiring some, albeit modest, payment of surplus income to the life beneficiaries. At the same time the Legislature has provided that additional income over and above the modest rate of payment shall be held until final adjustment, thus providing for equitable adjustments and balances as between life beneficiaries and remaindermen upon final liquidation, and safeguarding, so far as reasonably possible, the rights of all interested parties. The statute provides: " Any payment of net income heretofore or hereafter made to the life tenant up to such three per centum per annum shall be final and shall not be subject to recoupment from the life tenant or as a surcharge against the trustee or executor. The amount of all such payments shall be taken into account, however, in the apportionment of the proceeds of sale and shall be charged against the share of the life tenant.

In thus formulating a rule that is final against recoupment for distribution of income received in excess of carrying charges, it does not appear that the Legislature has done more than direct a trustee to do what under the decisions of this court he has discretionary power to do. (*Matter of Otis, supra.*) Before the enactment of this statute, the life tenant could not have demanded as of right the payment to him during liquidation of more of the surplus income than he will receive under the statute. Neither does it appear that the remaindermen could properly have insisted that the trustee should be surcharged if in the exercise of his discretion he had paid to the life tenant the amount which the statute now directs. A statutory rule of administration which requires the trustee to apportion income in accordance with a fixed standard which in the exercise of administrative discretion the trustee would even without the statute have power to adopt does not, in our opinion, constitute a taking of property. The principle is applicable that " The mere fact that the statute is retroactive does not bring it in conflict with the Federal Constitution. * * * Nor has a

person a vested interest in any rule of law entitling him to have the rule remain unaltered." (*Preston Co.* v. *Funkhouser*, 261 N. Y. 140, 144; *Munn* v. *Illinois*, 94 U. S. 113.)

As already noted, the rules of administration heretofore set forth were tentatively stated and expressly recognized as subject to change. Before a judicial declaration, thus tentatively stated, becomes a rule of property, it must have become permanently fixed and long continued. (*United States* v. *Standard Oil*, 20 Fed. Supp. 427, 458; affd., 107 F. [2d] 402, cert. den. 309 U. S. 673.) In that case the court said: "However, before setting up a judicial declaration as a rule of property, we should require, at least, that it be fixed, long-continued, and relied upon by persons acquiring property, so that its repudiation would amount to a denial of due process." Nor can the statute in the case at bar be said to be arbitrary or capricious, but on the contrary, it is fair and reasonable and protects the interest of both income beneficiaries and remaindermen. As was said in *Thompson* v. *Siratt* (95 F. [2d] 214, 217): "To hold that subsection (n) is repugnant to the Fifth Amendment requires a finding that its provisions are arbitrary and unreasonable."

We have, therefore, in the case at bar, no taking of property, no contract right involved and no impairment of due process. This statute, therefore, cannot be held to be unconstitutional. (*Robertson* v. *deBrulatour*, 188 N. Y. 301; *Brearley School, Ltd.*, v. *Ward*, 201 N. Y. 358.)

The sole remaining question is whether or not the statute is applicable in cases where the liquidation was complete before the date when the statute became effective, the income and proceeds of property being still undistributed in the hands of the trustee. We concur in the construction placed upon the statute by the learned Surrogate, namely, that its scope is limited to cases where liquidation of real property acquired is incomplete. This is in accord with the language of the statute which provides that net income "during the salvage operation" shall be paid to the life tenant. Even in a "pending proceeding" or "action for an accounting," the language of the statute confines its application to cases where liquidation is incomplete and where "during the salvage operation" a trustee has acted in accordance with the discretion at that

time vested in him. The apportionment of the proceeds of the property, both income and principal, where liquidation was completed before the statute became effective must be determined in accordance with the rules heretofore formulated by the court.

The order should be affirmed, with costs to the respondent trustee and one bill of costs to the infant-appellants, William J. Demorest, Jr., Ann Demorest and Charles Demorest, payable out of the fund.

LEWIS, J. (dissenting). The infant-appellants, by their special guardian, challenge the constitutionality of section 17-c, subdivision 2, of the Personal Property Law (Cons. Laws, ch. 41). The problem relates to the apportionment, between an income beneficiary and remaindermen, of income realized by a trustee from operations undertaken to salvage defaulted mortgages held by it as fiduciary. In this instance the mortgages in default were nine in number. The title to each mortgaged property came into the trustee either by foreclosure or by deed in lieu of foreclosure prior to April 13, 1940. Two of the properties were sold prior to that date, the avails of the sale being retained by the trustee.

The date last mentioned is important to our inquiry because it fixes the time when there became effective chapter 452 of the Laws of 1940 which added section 17-c to the Personal Property Law. It is the effect upon the rights of a life tenant and remaindermen of the retroactive provisions of subdivision 2 of that statute which has prompted the present challenge to its constitutionality.

Section 17-c of the Personal Property Law (added by L. 1940, ch. 452, effective April 13, 1940) provides rules for the administration of that portion of a trust fund in which is a real estate mortgage, held for the benefit of one or more tenants for life or a limited term with remainder over, where title to the mortgaged property has been acquired by the trustee by foreclosure or by conveyance in lieu of foreclosure. We are not here concerned with subdivision 1 of section 17-c which applies only to estates of persons dying, or trusts created, *after* its enactment and to mortgage investments made thereafter by a trustee of an existing trust. The challenge is to the constitutionality of subdivision 2 of section 17-c, the terms and rules of which " apply specifically (a) to the estates of persons dying *before* its enactment and (b) to mortgages on real property held by a trustee under a deed of trust or other

instrument executed *before* the date of its enactment and (c) to real property acquired by foreclosure of mortgage or real property acquired in lieu of foreclosure *before* or after the date of its enactment in trusts created or mortgage investments made prior thereto * * *." (Emphasis supplied.) In particular our inquiry goes to that portion of section 17-c to be found in subdivision 2 (a) which in general provides that, regardless of advances made from the principal of a trust for the expense of a foreclosure, or of a conveyance of mortgaged property in lieu of foreclosure, and regardless of the cost of all capital improvements, payments — not subject to recoupment — shall be made to the life tenant from the net income during the salvage operation up to three per cent per annum computed upon the principal amount of the mortgage.

Clearly subdivision 2 of section 17-c is retroactive. By its terms it presumes to affect acts which occurred, and rights which accrued, prior to April 13, 1940 — the effective date of the statute. Among acts thus affected was the execution on December 14, 1928, of the testamentary trust here involved; among rights thus affected are those of the life tenant and the remaindermen in the proceeds from transactions undertaken by the trustee as a means of salvaging mortgages which were a part of that trust — mortgages which, as we have said, were " security not for principal alone but for income as well." (*Matter of Chapal*, 269 N. Y. 464, 472.)

In the case last cited this court ruled that, upon a sale had in the course of a similar salvage operation (p. 472) — " * * * the proceeds should be used first to pay the expenses of the sale and the foreclosure costs and next to reimburse the capital account for any advances of capital for carrying charges not theretofore reimbursed out of income from the property. Then the balance is to be apportioned between principal and income in the proportion fixed by the respective amounts thereof represented by the net sale proceeds. In the capital account will be the original mortgage investment. In the income account will be unpaid interest accrued to the date of sale upon the original capital." (And see *Matter of Otis*, 276 N. Y. 101, 111; *Matter of McManus*, 282 N. Y. 420, 425.)

When the properties here involved came into the hands of the trustee, the rule of apportionment last quoted above was not a

matter of grace, as the majority opinion herein seems to hold. It was a rule of property the essential principle of which had long been recognized and applied in this jurisdiction and others, including England. (*Meldon* v. *Devlin*, 31 App. Div. 146; affd., 167 N. Y. 573 [1901]; *Parsons* v. *Winslow*, 16 Mass. 361, 365 [1820]; *Veazie* v. *Forsaith*, 76 Me. 172 [1884]; *Hagan* v. *Platt*, 48 N. J. Eq. 206, 207, 208 [1891]; *Greene* v. *Greene*, 19 R. I. 619, 621–624 [1896]; *Quinn* v. *First Nat. Bank*, 168 Tenn. 30 [1934]; *Matter of Nirdlinger*, 327 Penn. St. 171, 172, 173 [1937]; *Cox* v. *Cox*, L. R. 8 Eq. 343, 344, 345 [1869]; *Matter of Moore*, 54 L. J. Ch. 432 [1885], and see *Matter of Marshall*, 43 Misc. 238, 245 [1904].) A classical statement of the underlying principle which runs through the cases cited above was made in *Cox* v. *Cox, supra,* page 344 as follows: " The true principle *in all these cases is*, that neither the tenant for life nor the remainderman is to gain an advantage over the other — neither is to suffer more *damage* in proportion to *his estate and interest* than the other suffers — from the default of the obligor." (Emphasis supplied.) This was orthodox doctrine long before the decisions by this court in the *Meldon, Chapal* and *Otis* cases, *supra.*

In accord with that rule of property there had vested in the income beneficiary and the remaindermen respectively, prior to the effective date of section 17-c, subdivision 2, a proprietary interest in each of the properties acquired by the trustee. (*Matter of McManus, supra,* p. 426.)

Although the basis adopted by the courts for computing the item of interest involved differs in the various jurisdictions which have considered the question, there is a basic principle, as we have seen, which runs throughout the decisions cited above — *viz.*, that, in the income from salvage operations incidental to the administration of a trust estate, both life tenant and remainderman have a proprietary interest and both are entitled to be paid their proportionate shares thereof.

The comment made in *Matter of Rogers* (22 App. Div. 428; affd., 161 N. Y. 108), by Mr. Justice CULLEN — later Chief Judge of this court — applies with equal force in the case at hand where the rights of remaindermen are at stake (p. 436) —" The equities of a life tenant to receive the whole income that may accrue during his tenancy are every whit as great as that of the remaindermen to have

the *corpus* of the trust preserved unimpaired. \* \* \* *Why should each not have exactly his own, so far as it is possible to ascertain it?* " (Emphasis supplied.)

A marked difference should be noted between the provisions of section 17-c, subdivision 2, with which we are here concerned, and subdivision 1 of the same section. Unlike subdivision 2, the Legislature was careful in subdivision 1 to make its mandates in effect prospective — not retroactive. It also employed language by which its mandates would in no event conflict with any contrary intention which might be expressed by the creator of the trust.

The resultant effect of section 17-c, subdivision 2, is to transfer, without the right of recoupment, from the principal account of a trust to the income account, an amount — fixed arbitrarily and without regard to the demands of justice and equity in the circumstances at three per cent per annum computed upon the principal amount of each salvaged mortgage. Such a mandatory transfer to the life tenant of property rights which had become vested in the remaindermen under a rule of property which antedated the exactment of section 17-c, subdivision 2, transcends the Legislature's power. " Legislation which impairs the value of a vested estate is unconstitutional." (*Matter of Pell,* 171 N. Y. 48, 52, 53; *People* v. *O'Brien,* 111 N. Y. 1, 57–59; *Westervelt* v. *Gregg,* 12 N. Y. 202, 212.) As I view the statute it authorizes, without due process of law, the taking of property rights which became vested in the remaindermen under an established rule of property prior to the effective date of the statute. To that extent it violates the Fourteenth amendment to the Federal Constitution and article 1, section 6, of the Constitution of the State of New York.

I pass now to a phase of the problem which I think cannot be ignored. The questions of apportionment with which subdivision 2 of the statute attempts to deal are essentially judicial questions. This subject was examined by Story in his Equity Jurisprudence. ([2d ed.] vol. 1, § 489 *et seq.*) Stressing the " beneficial operations of courts of equity \* \* \* upon this confessedly intricate subject," he said: " Without some proceedings, in the nature of an account before a Master, there would be no suitable elements upon which any court of justice could dispose of the merits of such cases." In like vein it was said by Judge LOUGHRAN writing for this court in *Matter*

436

*of Otis, supra* (p. 115), that " * * * a general rule for such situations cannot be attained at a bound, that *no rule can be final for all cases* and that any rule must in the end be shaped by considerations of business policy." (Emphasis supplied.) Subdivision 2 of the statute attempts to override all this by saying that *in every case* the life tenant must at all events immediately and finally receive net income at a rate arbitrarily fixed by the statute at three per cent — no matter what may be the cross-equities of the parties and without regard for the business risks of the particular salvage operation. To this extent, subdivision 2 of the statute makes it mandatory that the court shall adjudicate every " pending proceeding or action for an accounting " without affording the parties any opportunity to be heard. The draftsmen of the statute apparently recognized some difficulty on that score, for the statute says: " Only *equitable* adjustments and balances *as between the parties* are intended to be effectuated by the provisions of this subdivision " [2]. (Emphasis supplied.) We have, then, this extraordinary situation: While subdivision 2 of the statute has not changed the law that pending questions of apportionment are to be decided upon equitable principles, yet it declares that such principles must be applied by the courts, not according to the judicial judgment of what is equitable in the circumstances of a pending controversy, but according to a legislative mandate rigidly enjoined for all pending cases.

The Legislature has no power so to declare the law " for the information and government of the courts in the decision of causes before them." (KENT, Ch. J., in *Dash* v. *Van Kleeck*, 7 Johns. 477, 508, 509.) In this connection it should be observed that subdivision 2 of the statute is not emergency legislation; it invokes neither the general welfare nor any other consideration of public policy. In the only opinion written below, it is said: " The Legislature has done no more in formulating a modification of existing rules than the courts themselves could do. * * *." (175 Misc. 1044, at p. 1050.) Such a proposition is not free from risk. Nobody knows what economic chaos may follow the present war. I am not prepared to say that as to all pending cases the Legislature may do at one stroke whatever courts of justice may do in accord with their tradition to proceed only in a particular controversy and only after taking evidence at a hearing held upon issues defined

by pleadings. The Legislature can no more exercise judicial power than our courts can exercise legislative power. (See opinion by RUFFIN, C. J. in *Hoke v. Henderson*, 25 Amer. Dec. p. 686 [N. C.].) The determination of rights of property *inter partes* is always a judicial question. As I view it, subdivision 2 of section 17-c of the Personal Property Law is a void attempt by the Legislature to make such a determination.

I am led by these considerations to dissent and vote for a modification of the Surrogate's decree accordingly.

LOUGHRAN, J. (dissenting). I add a few words to the dissenting opinion of Judge LEWIS in which I concur entirely.

The crux of the prevailing opinion is this striking sentence: "A statutory rule of administration which requires the trustee to apportion income in accordance with a fixed standard which in the exercise of administrative discretion the trustee would even without the statute have power to adopt does not, in our opinion, constitute a taking of property." I cannot assent to so free an appraisal of the retroactive mandate of the Legislature.

No authority is cited to show that it was always open to trustees of their own motion to pay net income to a life tenant at such a "fixed standard," in peremptory disregard of the recoupment rights of remaindermen. Indeed the general understanding of the profession appears to have been the other way, seeing that the Surrogates who devised the statute have vouchsafed us one reason alone for its enactment, *viz.*, "Trustees have hesitated to pay such net income because in the case of overpayment to the life tenant, the trustee might be surcharged with that amount." (See L. 1940, p. 1182.)

This recognition by trustees of the conflicting rights of remaindermen was not without justification. It is true that hitherto a trustee for a life tenant and remaindermen was entitled to distribute surplus income in his discretion. (*Matter of Otis*, 276 N. Y. 101, 115.) But that discretion was always to be exercised by a trustee with reasonable judgment and with an even hand between the life tenant and the remaindermen in the particular circumstances. (See *Carrier v. Carrier*, 226 N. Y. 114, 125, 126; 28 Halsbury's Laws of England [1st ed.] 123, 124; 2 Scott on The Law of Trusts, § 187; 4 Pomeroy on

Equity Jurisprudence, [5th Ed.] § 1062a.) The retroactive provisions of the statute direct trustees instanter to make final payment of net income to a life tenant not at a fixed rate merely, but at the expense of the remaindermen if need be. Hence I cannot accept the presupposition that the statute confers no new power upon trustees.

There is no occasion now for examination of the real nature of the equitable right of a trust beneficiary. At least the beneficiary owns the obligation of the trustee — a thing which is as truly the subject-matter of property as any physical object. (See Ames, Lectures on Legal History, p. 262. Cf. 1 Scott on The Law of Trusts, § 130.) Consequently I see no warrant for the view that the respective interests of beneficiaries of a discretionary trust are not rights of property in the constitutional sense. (See *Pritchard* v. *Norton*, 106 U. S. 124, 132.)

LEHMAN, Ch. J., RIPPEY, CONWAY and DESMOND, JJ., concur with FINCH, J.; LEWIS and LOUGHRAN, JJ., dissent in separate opinions in which both concur.

Order affirmed, etc.