## McDowell's Estate

Before Van Dusen, P. J., and Sinkler, Klein, Bolger, Ladner, and Hunter, JJ.

*James R. Wilson,* guardian and trustee ad litem, for exceptant.

*Witney & Thornton,* for life tenant.

*Marcellas H. McLaughlin,* for remaindermen.

*Thomas B. K. Ringe* and *John Russell, Jr.,* for amicus curiæ.

BOLGER, J., January 15, 1945.—The auditing judge decided that every foreclosed property be administered separately and on a yearly basis; that net rents be distributed annually to the life tenants, deficits be met from principal, and recoupment of excess net rents

must await liquidation. He dismissed the proposals of the guardian ad litem that the testator's intent as reflected in the will was that the old rule of hotchpot be applied to the foreclosed real estate both sold and unsold, but that in the event that apportionment be applied to the operation of the foreclosed properties all carrying charges be deducted from net rents on a unit basis, and that as to unsold foreclosed properties net rents be distributed up to but not more than four percent, any excess to be recouped to principal to meet deficits.

The basic facts of this case make it a model for apportionment. The estate is large and has been administered for many years; the present life tenants are a son and two daughters of the testator; remaindermen will be the appointees under the daughters' wills. The number of foreclosed properties is great—86 in number, representing 28.6 percent of the estate. Principal has increased from a total of $1,430,712.36 in 1891 to a value of $1,847,605.03 for three of the remaining four parts of the estate (one fourth having been previously distributed)—an enhancement through good management of 72 percent. On the other hand, income has shrunk 50 percent in the last 10 years of the accounting—a very serious depletion.

Testator directed the trustees "to hold, invest and keep invested in legal securities . . . and in improved paying real estate" and "to pay the whole income of my residuary estate" to the life tenants, his wife and later his children. In Nirdlinger's Estate (No. 2), 327 Pa. 171, where apportionment was first directed, testator provided that trustees pay to his son and his grandchildren "the net rents, issues, interest, income, dividends and revenues". The similarity in language of the wills and of the facts in the instant and in the cited case requires us to confirm the auditing judge's ruling in applying apportionment. We, therefore, dismiss the exception to the awards apportioning the proceeds of the sale of foreclosed real estate.

After the case was argued and reargued upon exceptions, the Fiduciaries Association was requested as amicus curiæ to file a brief, which it kindly provided and which has proved of great assistance to the court in the elucidation and determination of the questions at issue.

The application of the doctrines of distribution of net rents and of its corollary, recoupment, as laid down in the second Nirdlinger decision, 331 Pa. 135, the main question involved. The hardship in applying the doctrine of recoupment, which requires the life tenant to suffer deduction of future or other income after having received and, no doubt, spent the net rents as distributed, in accordance with the doctrine of recoupment and of the manner of the general administration of the salvage period, is responsible for the extended consideration given this case.

The suggestions of the Fiduciaries Association are as follows:

1. The existence of "net rents" is not to be determined on an annual basis, but rather on periodical reviews of the salvage operation from the date of default until the reviews are made. In the present case the entire period beginning with the date of default and ending with the date of filing the account or approval of the schedule of distribution is to be considered before the existence or nonexistence of "net rents" can be ascertained.

2. To the extent that net rents have been produced, they must be paid out to the life tenants in full, irrespective of what percentage of return on the investment they may represent.

3. Prior operating deficits, paid by principal, must be repaid out of subsequent earnings before any part of such earnings is distributed to life tenants as "net rents".

4. Where earnings have previously been paid to life tenants, subsequent operating deficits must be paid

from the general income of the trust in an amount up to but not exceeding the earnings previously paid to the life tenants.

These suggestions are predicated upon the theories that the second Nirdlinger case treated the net rent distribution problem on the basis of one accounting period, i. e., the entire salvage period, and that "net rents" cannot have two meanings, one when the salvage operation is completed and the net rents are to be added in the determination of "net proceeds", and the other when we are considering the question of income which might be distributable from a particular property to life tenants prior to sale. It is further stated that the corporate fiduciaries have no uniform practice in ascertaining and administering net rents.

Before discussing the issues and the suggested solutions, it is necessary to comprehend the origin and the development of the policy and of the law of this type of apportionment in this State. In Nirdlinger's Estate (No. 2), 327 Pa. 171, the syllabus states: "The net proceeds received from the sale of the property are apportioned . . ."; but on page 175 of the opinion, to which the syllabus refers, it appears the court adopted from the A.L.I. Restatement of the Law of Trusts, sec. 241, only the maxim of apportionment and the formula accomplishing it. Paragraph 2 of section 241 of that authority is cited with the statement (p. 175) : "The application of the rule will be seen in the comments and illustrations set forth." However, the court's failure to cite paragraph 1 of that authority becomes very eloquent in the light of our highest court's treatment of apportionment in the later Nirdlinger decision, 331 Pa. 135. Paragraph 1 reads as follows:

"(1) Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary is property which the trustee is under a duty to sell, and which produces no income or an income substantially less than

the current rate of return on trust investments, or which is wasting property or produces an income substantially more than the current rate of return on trust investments, and the trustee does not immediately sell the property, the trustee should make an apportionment of the proceeds of the sale when made, as stated in Subsection (2)."

Apportionment thereunder is not to be made (1) until the end of the salvage operation when the property is sold, (2) and only then if, inter alia, the administration of the property has produced "no income or an income substantially less than the current rate of return on trust investments . . .", and (3) this latter fact must be determined apparently by a judicial finding of fact.

In the later Nirdlinger decision (supra) these three conditions were ignored and an independent set of subsidiary rules was set up which governs not so much the distribution of the proceeds after sale, but more particularly the complete administration of the salvage operation prior to sale. These new rules require that all distressed property be administered separately; all net rents be distributed "presently"; all deficits be met out of principal; and excess payments of net rents be recouped from income. In our opinion, these new rules are incompatible with the conditions contained in the Restatement. The application of the rules under this decision not only begins as soon as the property is set apart from the other assets of the estate, but they contain no conditions in order to determine whether or not the apportionment doctrine in any of its aspects shall be applied, and consequently reserve nothing for judicial determination. An equally significant hiatus appears in the Restatement.

Except for the provision contained in section 233 (m) of the Restatement, which was adopted in the later Nirdlinger decision and which requires that deficits incurred in handling nonproductive property be met out of principal, that authority is silent as to de-

tails of administering property prior to sale. From this comparative silence we believe that the Restatement implies the operation of salvage to be generally under the old rule of hotchpot, and the trustee remains vested with a wide discretion as to when distribution of net rents is to be made.

It is patent that our Supreme Court, in going beyond and in partial conflict with the Restatement, has proceeded upon a policy different than that implied in the Restatement. Under the latter the life tenant may have to await the sale of the property to receive any income, whereas our new rules suspend the operation of hotchpot during the salvage period, withdraw entirely the power of discretion from the trustee in the distribution of income, and direct that immediate relief be given to the life tenant by distributing to him all net rents "presently". When it is realized that salvage periods are often spread over 10 years or more, the wisdom of the Pennsylvania policy becomes plain.

Finally, while the Restatement defers the decision of apportionment to the time of sale by weaving its new rules of salvage operation together with the maxim of apportionment, it has created an integrated pattern of apportionment. Once any single principle of this pattern, subsidiary or otherwise, is applied, the application of all of them naturally follows. Therefore, as soon as the necessity arises to salvage a property, bought in on foreclosure of mortgage, apportionment becomes mandatory.

This Pennsylvania apportionment structure is subject to objection. It requires the trustee to keep a reasonable portion of the balance of principal of the estate in a more or less liquid condition to provide for deficits. In many cases where there is no other principal or if the other principal be underproductive property, the trustee must either permit deficits to accumulate as long as possible, or in order to meet them borrow on mortgage or otherwise, and thus possibly expose the assets to the mercy of money lenders or compel the

trustee to sell at a sacrifice. We can only suggest the same answer as was made in the later Nirdlinger case, where the court said (p. 140) :

"The worst that could happen to the corpus would be that the property, when sold, would not bring enough to cover the advancements. This we think most unlikely."

No alternative method of fulfilling the purpose of our apportionment scheme suggests itself to us.

The position taken by the amicus curiæ appears to be similar to that assumed by the fiduciaries in the later Nirdlinger case (supra), that since section 241 of the Restatement requires the addition of net income to the net sale price in determining the net proceeds the trustee is required to retain or dam up the net rents until liquidation because the total amount of them might well exceed the life tenant's share of proceeds upon apportionment; that if the trustee paid out net rents as he received them he would subject himself to surcharge; and that other income be made to supply deficits on unproductive property—that the life tenant "take the bad with the good". These arguments were rejected by the Supreme Court in that decision when it decreed the separate administration of the several properties, the distribution of net rents, and the supplying of deficits out of principal, forbade the utilization of other net income for that purpose, and prescribed the recoupment of excess "net rents" as determined upon application of the formula to the "net proceeds" of operation and sale. The court said (p. 139), after rejecting the collective plan of administration:

". . . net rents, based upon the return from each individual property, shall be distributed to life tenants. . . . The carrying charges on unproductive property can be advanced out of principal."

Section 233 (m), Restatement of Trusts, which announces this principle is cited; from it we add the following quotation (p. 140) :

"Thus, taxes and other carrying charges on unproductive land are payable out of principal, even though .

the trust includes other property from which an income is derived."

We are of opinion that this section applies to an intermittently unproductive property as well as to one permanently unproductive.

Distribution of "net rents" is one of the doctrines enunciated in the second Nirdlinger decision, and presupposes two things: (1) The ascertainment of the balance of rentals over and above carrying charges during a given period, and (2) the actual disbursement of that balance as distinguished from a mere calculation thereof. It is true the Supreme Court did not state what period was to be covered in the determination of "net rents" or when the distribution should be made, but in its statement of the problem and its solution thereof we understand the court to mean annual distribution as the auditing judge has decided. The court said (pp. 137-38):

"Three solutions are proposed to us: (1) That the net rents shall be held by the trustees until the properties are sold, when the formula fixed by us shall be applied; (2) that the trustees may pay over the rents or a portion thereof to the life tenants in the trustees' discretion; (3) that all the net rents be paid over to the life tenants, (*a*) with a liability to refund to the corpus of the trust any amount received in excess of that which the formula gives; (*b*) without the requirement to refund anything."

In adopting the third of these alternatives the court said (p. 139):

"The real intent of testators is that life tenants shall *presently* receive accruing income, and, therefore, we think net rents from foreclosed properties . . . should be paid to life tenants." (Italics supplied.)

In using the phrase "all the net rents shall be paid to the life tenants" we infer that not only all rents shall be added to the proceeds of sale to determine the "net proceeds" of the administration of the property, but also that such net rents should be actually distributed

"presently", i. e., during the salvage period in order to alleviate the hardship of the life tenant. In interpreting this positive position, we must conclude that the court intended such accounting and payment periods to be those ordinarily observed in the handling of estates which, admittedly, is annually. Annual distribution of net income fulfills much more effectually the declared purpose of apportionment because it both relieves the immediate distress of the life tenant and strikes a balance when the property is sold. The proposal that the term "net rents" has but one meaning in the field of apportionment is thus seen to be erroneous. The reference to it in the Restatement and elsewhere is largely for statistical purposes, whereas the express reference as above outlined demonstrates beyond doubt the correct dual significance given it by the auditing judge, both practical as well as statistical.

The final phase of apportionment is recoupment. There are two items of recoupment. The first is uncontroverted; it consists of the return to principal after sale of advancements made to salvage the property, including the costs of foreclosure of property, of restoring the property for purposes of tenancy, and operating deficits advanced under section $233\,(m)$ of the Restatement (supra). These items are the first to be deducted from the proceeds of sale pursuant to the Restatement and the second Nirdlinger decision. In the latter case, the Supreme Court said (p. 140) : "These advancements can be recouped when the properties are sold." The other type of recoupment presents a substantial problem. It involves the repayment of excess or overpayment of net rents during salvage. By definition, it is the amount by which net rents paid to the life tenant during the salvage period exceed the total share to which the life tenant becomes entitled under the formula prescribed in the Restatement and adopted by the Supreme Court. It is the actual sum received by the life tenant in advance of sale, at a time when his share under apportionment is indefinite, as compared

with the amount to which he becomes entitled after sale when the amount is ascertained under the algebraic formula. It is a form of advancement. If the amount of net rents distributed to the life tenant is small, the necessity for recoupment becomes slight, irrespective of the amount yielded by the sale, whereas if the amount of net rents is great and the sale price is small the need for recoupment is commensurately enhanced and the problem thereby becomes acute. This is caused by the zeal of our courts to preserve to life tenants their incomes "even though it may result in ultimate diminishment of principal to be paid to far off remaindermen".

Just as the Restatement fails to provide for the distribution of net rents, so is it equally silent on this subject. However, the majority of this court in the second Nirdlinger case, 34 D. & C. 36, held that the trustees may recoup the amount of overpayment out of other income in hand or out of future income. The Supreme Court upon appeal said recoupment can be had "from income in their [trustees'] hands". The difference in language may be significant since the Supreme Court rejected the principle of the handling of all the properties as a unit, which the lower court decreed, and adopted the separate administration of properties which had been suggested by President Judge Van Dusen in his dissenting opinion. However, the Supreme Court did not discuss the possible inability of the trustee to recoup overpayment of net rents as it did the possible failure to recoup operating deficits, in which latter case it stated that if such deficits cannot be recovered "the worst that can happen to corpus is that the sale will not yield sufficient to repay these items". Complete loss from overpayment of net rents is something not to be anticipated. Furthermore, the first class of advancement is treated preferentially in the distribution of the proceeds of sale and results in negligible chance of loss, whereas the recoupment of excess net rents is not given preferential treatment, in

which case great chance of loss to principal is possible unless recourse is to be allowed against income in some other manner.

There are but three possible sources from which recoupment may be had: (1) Other income during salvage; (2) income's share of the proceeds of sale; (3) other income on hand at the time of sale or income acquired thereafter. The first of these is excluded under section 233 (m) of the Restatement, as explained hereinbefore, due to the requirement thereunder that all operating deficits be met out of principal. The second eliminates itself by the very definition of overpayment, i. e., there is nothing remaining due to income from the proceeds of sale. The third, therefore, is the only source remaining. The availability of this source is subject to controversy. It can be said that it is more consistent with the principle of separate handling of properties to let the distribution of the proceeds terminate the unfortunate transaction without drawing upon other income after sale, just as we are forbidden under section 233 (m) (supra) to do prior thereto; that requiring accountability from income after sale characterizes the distribution-of-net-rent doctrine as merely a temporary benefit or loan, whereas the real purpose is a distribution of a lasting and permanent character of "income . . . preserved to them [the life tenants] . . ." However, in essence, this suggestion involves a complete elimination of recoupment of overpayments of net rents, which in our opinion cannot be allowed.

This form of recoupment must be exacted under the second Nirdlinger decision, for two reasons. The problem was there expressly ruled. At page 138 two possible solutions were suggested:

"(3) that all the net rents shall be paid over to the life tenants, (a) with a liability to refund to the corpus of the trust any amount received in excess of that which the formula gives; (b) without the requirement to refund anything".

The answer, of course, is given in the phrase already cited, that the trustees can recoup from income in their hands the amount of such overpayments. Failure to sustain the principle of recoupment would result in income receiving more from the processes of salvage and sale than section 241 of the Restatement, adopted by our Supreme Court, provides. On the other hand the sustaining of the principle results in exactly the amount of distribution provided under the formula and, therefore, the amount which the court prescribes. We have no authority to expose principal to loss beyond this amount. Therefore, in our opinion, when the Supreme Court said, "The trustees can recoup from income in their hands . . .", it meant income in the hands of the trustees at the time of sale or accruing from any source thereafter, and that the trustees shall have a lien upon such other income until the overpayment is fully met.

However, in the light of facts not apparent originally, these rules, like many other new ones, are subject to reconsideration. Our real estate market lately has been yielding rentals far beyond fair ratio to sales. The result has been that life tenants have been overpaid net rents, all of which they have spent without any warning of possible restitution, and they are now faced with the deprivation of further income in order to recoup the excess to principal. They find themselves in the position of receiving with one hand and having to pay back with the other. Therefore, were we free to do so, we would adopt the proposal of the guardian and trustee ad litem adopted from the New York statutory law.

The guardian and trustee ad litem presents for our consideration the existing New York statute—New York Laws, 1940, c. 452, p. 1182—section 2(a) of which provides that the life tenant shall receive up to three percent per annum on the principal of the mortgage and prohibits any recoupment of any portion thereof, and in section 2(b) any excess over such three

percent is paid to principal to repay advances, and when these are paid the balance is accumulated against the day of sale of the security. The statute, which was declared constitutional in In re West's Estate, 289 N. Y. 423, provides that the three percent distributed shall likewise figure in the determination of net proceeds after liquidation. The guardian and trustee ad litem very logically suggests that the limit of three percent we find in the New York act be increased to four percent, which is the current rate for trust investments fixed in the first Nirdlinger decision (supra).

Counsel for the Corporate Fiduciaries Association combat this suggestion with the assertion that, first, this proposal is contrary to the second Nirdlinger decision, which directs that all net rents be paid out, not merely in an amount up to four percent of the face of the investment; and, second, upon final apportionment the life tenant does not receive the average rate of return on the principal investment, but the average rate of return upon the net proceeds of sale, which are usually substantially lower than the investment in the property. Therefore, the suggestion would not achieve the result desired.

In answering these objections, we, of course, agree that the proposed rule is contrary to the second Nirdlinger decision. However, the argument that the distribution annually up to four percent of principal from the net rents might cause an overpayment and result in loss therefore to principal is not persuasive. It is perfectly clear that such possibility of loss to principal under the four percent distribution doctrine would be less than that under the rule now existing and, therefore, there would be less to be recouped at the end. As Judge Stearne of this court said in Nirdlinger's Estate, supra (p. 39): Therefore, it is the remainderman and not the life tenant who must suffer this risk of possible loss." It would remedy to a considerable degree the evil involved in applying recoupment

by softening the impact of recoupment on the life tenant, if not altogether eliminating it. It would appear to moderate considerably the whole administration of the distressed investment. True, it might add to the trustee's accounting problems, but not seriously so, when we compare it to the difficulty of solving the complicated algebraic formula.

Therefore, while we are obviously obliged to formally reject this proposal of the guardian and trustee ad litem, we do so only because of our obligation to follow established authority as we construe it. But in dismissing it we recommend that an appeal be taken to our highest court so that that tribunal may have an opportunity of reconsidering the application of the doctrine of recoupment in the light of new facts which, as stated, were not before it when previous decisions were rendered.

The exceptions are dismissed and the adjudication is confirmed absolutely.

Judge Klein concurs in the result of this decision.

Van Dusen, P. J., concurring. — I concur in the result and, in the event an appeal is taken, respectfully urge the Supreme Court to reconsider its ruling that a life tenant must refund the sums received as current rents so far as they exceed the amount allocated to income on completion of the salvage operation. I refer to my dissenting opinion in the second Nirdlinger case, found at 34 D. & C. 39.

Ladner, J., concurring.—I am in accord with the result arrived at by Judge Bolger's opinion and with what he says therein except the portion in which he holds that the trustees may recoup advancements made out of principal when the salvage operation is completed, from income *from any source whatever* and that the trustees have a lien upon *such other income* until the overpayment is fully met.

As I have heretofore suggested in my concurring opinion in Doherty's Estate, 49 D. & C. 453, at p. 456, I do not regard our own decision in the Nirdlinger case (34 D. & C. 36, modified by the Supreme Court on appeal in 331 Pa. at page 135) as binding on this point because it was predicated upon the proposition that *all investments* must be taken together in arriving at what the testator meant by the words "net income". The Supreme Court on appeal rejected that view and ruled that each investment must be considered separately. Unless the Supreme Court's statement in its opinion on that appeal, viz (p. 173), "Life tenants should not be required to starve in order that remaindermen may ultimately feast," is mere sounding brass and tinkling cymbal, there should be no recoupment at all except out of and to the extent the proceeds of the completed salvage operation permit it. After all, there is no advantage in giving a life tenant the net rents during a salvage operation if she is afterward compelled to restore a deficit to principal from her other income. Unduly protracting a salvage operation might give rise to such deficit, so whenever possible the property should be sold before such a situation arises.

The question whether recoupment should or should not be limited to the segregated property or its proceeds has not been regarded as settled by the Nirdlinger decision, 331 Pa. 135, in at least two articles in the Fiduciary Review (see article by the editor of Fiduciary Review in issue of July 1938, page 3, and article by W. H. Conger, Jr., Esq., Fiduciary Review, February 1942). For these reasons and for the reasons expressed in my supplemental adjudication in this case, which I need not repeat, and under the authorities cited, I would rule that recoupment must be limited to the share of the proceeds to which the life tenant would be entitled, and that this is exactly what the Supreme Court meant when it said, at page 140:

"The worst that could happen to corpus would be that the property, when sold, would not bring enough to cover the advancements."