In the Matter of the Accounting of DANIEL PLOGER et al., as
Substituted Trustees under the Will of WILLIAM MANGER,
Deceased.

Surrogate's Court, Westchester County, July 20, 1945.

*Clark, Higson & Litsch* for trustees, petitioners.

*Arleigh Pelham* for Lilian W. Manger, respondent.

*Joseph J. Corn* for Charles C. White, respondent.

*Gilbert M. Landy,* special guardian for Charles K. White and another, respondents.

GRIFFITHS, S. In this trustees' intermediate accounting proceeding objections have been interposed by certain remaindermen to the manner in which petitioners have allocated the proceeds of a mortgage salvage operation.

The decedent died in 1928. Under paragraph "Third" of his will, duly probated in this court on October 9, 1928, he established nine separate trusts only three of which, however, are in issue. The three trusts, with respect to which objections have been interposed, are for the benefit of Julius A. White — trust E, Charles C. White — trust F, and William Myers — trust G. The provisions of the will as to each of these trusts are identical, except as to the names of the respective income beneficiaries. As to each trust, provision is made for the payment of the remainder interest to the surviving issue of the respective life tenants and, in the absence of such issue, the corpus of each trust is directed to be paid to the residuary legatee Julius Manger, a brother of the testator. The respondent Lilian W. Manger is trustee under a declaration of trust dated November 25, 1931, made by the said Julius Manger. Originally each of the trusts had $100,000 as principal. Although the date is not stated, sometime prior to the judicial settlement of their prior account filed herein June 11, 1935, the trustees invested the sum of $266,750, in a consolidated bond and mortgage in that amount covering improved real property known as 63–65 West 36th Street, Borough of Manhattan, City of

New York. In this investment the Charles C. White and William Myers trust each had an undivided interest in the sum of $100,000, and the Julius A. White trust had a similar interest to the extent of $66,750. The principal of said consolidated bond and mortgage became due and payable on September 1, 1935, with interest at 5½% per annum. Interest is in default from June 10, 1934.

Upon the occurrence of defaults in payment of interest and taxes, the trustees instituted foreclosure proceedings and acquired title to the mortgaged property on February 14, 1935. The trustees operated the property from the date of acquisition to August 31, 1944, at which time it was sold for the sum of $285,000, the purchase price consisting of $50,000 in cash and a purchase-money mortgage in the sum of $235,000. After adjustments and necessary expenses of sale, the net cash realized amounted to $42,374.57.

It further appears that the net rentals received by the trustees during said period of operating the property aggregated $135,868.94. Out of such net rentals and prior to January 1, 1940, the trustees paid all foreclosure and related expenses and made payments to the income beneficiaries of the three trusts at a rate varying between 4% and 5% per annum based upon the principal amount of the original mortgage investment. Subsequent to January 1, 1940, the payments to the income beneficiaries were reduced to and have been continued at the rate of 3% per annum as prescribed by section 17-c of the Personal Property Law (subd. 2, par. [a]). The payments to the income beneficiaries during the accounting period aggregated $99,364.36. It therefore appears that the salvage fund consists of the following: net cash receipts from the operation of the property, $135,868.94; the net cash received on the sale of the property, $42,374.57, and a purchase-money mortgage in the sum of $235,000. The purchase-money mortgage is amortized at the rate of $881.25 quarterly for the first five years, and thereafter at the rate of $1,175 quarterly until July 15, 1954, on which date the unpaid balance of principal amounting to $195,050 will become due and payable.

The basic figures employed by petitioners in the application of the so-called *Chapal-Otis* rule (*Matter of Chapal*, 269 N. Y. 464; *Matter of Otis*, 276 N. Y. 101, reargument denied 277 N. Y. 650) are conceded to be correct. Due to the comparatively small amount of cash received on.the sale of the property, however, there is insufficient cash presently available to pay in full the amount properly allocable to the principal accounts of the

three trusts.  In order to make whole such principal accounts petitioners have deducted from the purchase-money mortgage participating shares allocable under the formula to income, an amount equaling such deficiency in cash and credited the same to principal.  Resulting adjustments in the cash allocations have likewise been made.  The remaindermen have no objections to the apportionment figures, but insist that to the extent principal is receiving a larger interest in the purchase-money mortgage in lieu of cash, they be granted a prior preferred interest in the mortgage and that all amortization payments made on account thereof, so far as necessary, be paid into principal account until the sum in question has been repaid in full.

It is undisputed that there were no " principal advances " made in the usually accepted meaning of the term.  The foreclosure and related expenses of acquiring title to the property were paid out of income.  Objectants assert, however, that the inability to satisfy principal's proper apportionment of cash is due to payments made to income prior to the effective date of section 17-c of the Personal Property Law at a higher rate than 3% per annum and that therefore to that extent " principal advances " were made *directly* to income.  Among other things, paragraph (d) of subdivision 2 of the statute reads in part as follows: " The purpose of the enactment of this subdivision is declared to be the simplification of the rules of procedure in mortgage salvage operations and the elimination of present complications which work to the disadvantage of the life tenant, who is usually the principal object of the testator's or settlor's bounty, by depriving him of a fixed right to the actual payment of any net income earned by the property.  Such fixed right is granted in lieu of the discretion now given to the trustee to pay net income or any part thereof to the life tenant.  The general rules of the apportionment of the proceeds of sale between life tenant and remainderman are retained subject to the express modifications made herein.  Only equitable adjustments and balances as between the parties are intended to be effectuated by the provisions of this subdivision."  It follows that the *Chapal-Otis* rule of determining the fractional interest of principal and income continues.  Although the term " principal advances " is not expressly defined by statute, paragraph (a) of subdivision 2 states that net income during the salvage operation up to 3% per annum upon the principal amount of the mortgage shall be paid to the life tenant " regardless of principal advances for the expenses of foreclosure or

of conveyance in lieu of foreclosure and arrears of taxes and other liens which occurred prior to such foreclosure or conveyance and the cost of all capital improvements." Paragraph (b) of subdivision 2 provides that: " The *foregoing principal advances* shall be repaid out of excess net income above such three per centum per annum. When principal advances have been satisfied, any excess income shall be impounded (subject to reinvestment under the terms of the will or deed) to await sale and apportionment." (Italics added.)

Paragraph (c) of subdivision 2 reads as follows: " The *unpaid principal advances* shall be a primary lien upon the proceeds of sale and shall be paid first out of any cash so derived. If insufficient the balance shall be a primary lien upon any purchase money mortgage received upon the sale." (Italics added.)

A reading of the statute indicates quite clearly in my opinion that the drafters of this legislation intended to limit the term " principal advances " to the items enumerated in paragraph (a) of subdivision 2 and similar items of expenditure and to limit the primary lien upon any purchase-money mortgage accordingly. This interpretation finds support in the pronouncements of the courts with respect to the authority of trustees to disburse surplus income prior to the enactment of this legislation. In *Matter of Chapal* (161 Misc. 67, 76) the Surrogate defined the duties and authority of trustees with respect to surplus income as follows: " If the income of a particular parcel is more than sufficient to pay carrying charges, the trustees will be bound to exercise their own discretion and judgment upon the question of distributing such surplus income entirely, or retaining the same or some part thereof to meet possible subsequent deficiencies." The Court of Appeals in *Matter of Otis* (276 N. Y. 101, *supra*) adopted this view, stating at page 115: " On this phase of the problem, we prefer the view of the Surrogate whose decree was before us in *Matter of Chapal*, that is to say, that the trustee may distribute such surplus income in its discretion. (269 N. Y. at p. 470.) This discretion, moreover, should be exercised with appropriate regard for the fact that *unless a life tenant gets cash he does not get anything in* the here and now." (Italics added.)

In *Matter of West* (289 N. Y. 423) the Court of Appeals prefaces the above-quoted statement from the *Otis* case (*supra*) with the following remarks at page 429: " It was also carefully pointed out that no hard and fast rule was laid down to guide the trustee in the disposition of net income earned during the

salvage operation, but the disbursement of net income to the life beneficiary was left to the discretion of the trustee.'' That the statutory primary lien was intended to be limited to the principal advances enumerated in the statute is indicated by Surrogate FOLEY in *Matter of West* (175 Misc. 1044) where he stated at page 1062: '' Since unpaid principal advances are a prior lien upon the proceeds of sale of the salvaged property (*Matter of Chapal, supra; Matter of Otis, supra;* Pers. Prop. Law, § 17-c), the principal has a prior interest in or lien upon the purchase-money mortgage taken back by the trustee upon the sale. In those circumstances, amortization payments made by the new mortgagor should be credited entirely to principal on account of such prior lien. When the principal advances have been entirely repaid, the amounts received for amortization should be apportioned between principal and income in accordance with the respective shares of each, previously computed and apportioned under the *Chapal-Otis* rule.''

Here, the objectants do not question the propriety of the act of the trustees in making payments to income in question during the salvage operation, their objections being specifically limited to the apportionment question. For present purposes, therefore, such payments made prior to January 1, 1940, must be deemed to have been properly made. The total payments to income, both prior and subsequent to January 1, 1940, aggregated $99,364.36. Under the apportionment formula income account would be presently entitled to $64,148.84 of the available cash, which is $35,215.52 less than the amount it has heretofore received.

To sustain the contention of objectants by giving principal a prior interest and lien in the purchase-money mortgage would be tantamount to directing a recoupment pro tempore from the life tenant of a portion of their income prior to the enactment of section 17-c, to which payment no specific objection has been made. In my opinion, this result would be contrary to the authorities and statute. (*Matter of Chapal,* 269 N. Y. 464, *supra; Matter of Otis,* 276 N. Y. 101, *supra,* reargument denied 277 N. Y. 650; *Matter of West,* 289 N. Y. 423, *supra; Matter of Schnitzler,* 179 Misc. 957, affd. 290 N. Y. 885, affd. *sub nom. Demorest* v. *City Bank Co.,* 321 U. S. 36; Personal Property Law, § 17-c.) Prior to the enactment of section 17-c, the rule was well settled that the primary lien for '' principal advances '' was limited to the items now enumerated in the statute. (*Matter of Chapal, supra; Matter of Otis, supra.*) Although no reported case has been brought to my attention

and independent research has failed to disclose any in which the question of recoupment of income paid to the life tenant prior to the enactment of section 17-c was directly involved, the statements of the Court of Appeals indicate its probable disposition of such a question. In both *Matter of Otis* (*supra*) and *Matter of West* (*supra*) that court affirmed and reiterated the rule first enunciated by the surrogate in *Matter of Chapal* (161 Misc. 67, *supra*) that prior to the enactment of section 17-c a trustee could distribute surplus net income in his discretion. In upholding the constitutionality of this legislation the Court of Appeals stated in *Matter of West* (*supra,* p. 430) that in formulating a rule that is final against recoupment, the Legislature did no more than direct a trustee to do what under the decisions he had discretionary power to do. The court added that before the enactment of the statute the life tenant could not demand, as of right, payment of any surplus income and that likewise remaindermen could not properly insist upon surcharging the trustee for paying to the life tenant the amount which the statute now directs. Furthermore, the dissenting opinions in *Matter of West* (*supra,* pp. 432, 437) indicate that the court considered the question of recoupment in its deliberations. (See, also, *Matter of Schnitzler, supra.*) These decisions and the language of the statute are entirely inconsistent with the existence of any such right of recoupment directly or indirectly for the benefit of the remaindermen. On the contrary it is evident in my opinion that the Legislature intended to continue the well-settled case law, that after principal has been reimbursed for the specified " principal advances ", equality between principal and income with respect to the prorata apportionment of the salvaged property should be preserved. This interpretation finds support in the explanatory note which was printed in the legislative bill, which reads, in part, as follows: " The present rules for apportionment between life tenant and remainderman under the *Chapal-Otis* cases are continued as to existing trusts where the investment in a mortgage has been made, with modification thereof in two specific instances." (Note, L. 1940, ch. 452.) The two instances are stated to be: First, provision is made for paying net income to the life tenant up to 3% per annum without recoupment from the life tenant and without possible surcharge against the trustee or executor. Secondly, the fiduciary is directed to use any surplus net income for the payment of advances from principal and to hold the balance to await sale and apportionment under the *Chapal-Otis* rule. The history and purpose of this

legislation is ably outlined by Surrogate FOLEY in *Matter of West* (175 Misc. 1044, 1048, *supra*). In other words, the primary object sought to be attained in the enactment of subdivision 2 of the statute was to assure payment to the life tenant of the entire net income realized during the salvage period not exceeding, however, a sum representing 3% of the original investment. It does not appear that there was any right of recoupment except possibly for principal advances prior to the enactment of the statute and there is no express or implied provision in the statute granting such right with respect to income in excess of the statutory rate paid to the life tenant prior to the enactment of the statute in accordance with then well-settled case law. (*Matter of West*, 289 N. Y. 423, *supra; Matter of Schnitzler*, 179 Misc. 957, affd. 290 N. Y. 885, affd. *sub nom. Demorest* v. *City Bank Co.*, 321 U. S. 36, *supra*.)

Nor may the legality of the resulting salvage investment be employed as a proper test in determining the respective rights of income and principal. Militating against the wisdom of adopting such a test are " considerations of business policy." (*Matter of Otis*, 276 N. Y. 101, 115, *supra*.) The legality of mortgage investments is determined by not only general economic trends, but often by changing local conditions. While it is true that the ultimate liquidation of this mortgage cannot be guaranteed, likewise it cannot be assumed that an eventual loss will be sustained.

I conclude that the apportionments made by petitioners are proper. The objections are accordingly overruled and dismissed.

Settle decree.